## NATIONAL LABOR RELATIONS BOARD *v.* ERIE RESISTOR CORP. ET AL.

No. 288.   Argued February 18–19, 1963.—Decided May 13, 1963.

*Norton J. Come* argued the cause for petitioner.   With him on the brief were *Solicitor General Cox, Stuart Rothman* and *Dominick L. Manoli.*

*John G. Wayman* argued the cause for respondents. With him on the brief for respondent Erie Resistor Corp. were *John C. Bane, Jr.* and *Irving Olds Murphy.*   On the briefs for respondent International Union of Electrical, Radio & Machine Workers, Local 613, AFL–CIO, were *Benjamin C. Sigal* and *David S. Davidson.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The question before us is whether an employer commits an unfair labor practice under § 8 (a)[1] of the

---

[1] "SEC. 8 (a).   It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

National Labor Relations Act, 61 Stat. 136, 29 U. S. C. § 158, when he extends a 20-year seniority credit to strike replacements and strikers who leave the strike and return to work. The Court of Appeals for the Third Circuit in this case joined the Ninth Circuit, *Labor Board* v. *Potlatch Forests, Inc.,* 189 F. 2d 82 (and see *Labor Board* v. *Lewin-Mathes,* 285 F. 2d 329, from the Seventh Circuit), to hold that such super-seniority awards are not unlawful absent a showing of an illegal motive on the part of the employer. 303 F. 2d 359. The Sixth Circuit, *Swarco, Inc.,* v. *Labor Board,* 303 F. 2d 668, and the National Labor Relations Board are of the opinion that such conduct can be unlawful even when the employer asserts that these additional benefits are necessary to continue his operations during a strike. To resolve these conflicting views upon an important question in the administration of the National Labor Relations Act, we brought the case here. 371 U. S. 810.

Erie Resistor Corporation and Local 613 of the International Union of Electrical, Radio and Machine Workers were bound by a collective bargaining agreement which was due to expire on March 31, 1959. In January 1959, both parties met to negotiate new terms but, after extensive bargaining, they were unable to reach agreement. Upon expiration of the contract, the union, in support of its contract demands, called a strike which was joined by all of the 478 employees in the unit.[2]

The company, under intense competition and subject to insistent demands from its customers to maintain deliv-

---

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization; . . .

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9 (a)."

[2] In addition to these employees, 450 employees in the unit were on layoff status.

eries, decided to continue production operations. Transferring clerks, engineers and other nonunit employees to production jobs, the company managed to keep production at about 15% to 30% of normal during the month of April. On May 3, however, the company notified the union members that it intended to begin hiring replacements and that strikers would retain their jobs until replaced. The plant was located in an area classified by the United States Department of Labor as one of severe unemployment and the company had in fact received applications for employment as early as a week or two after the strike began.

Replacements were told that they would not be laid off or discharged at the end of the strike. To implement that assurance, particularly in view of the 450 employees already laid off on March 31, the company notified the union that it intended to accord the replacements some form of super-seniority. At regular bargaining sessions between the company and union, the union made it clear that, in its view, no matter what form the super-seniority plan might take, it would necessarily work an illegal discrimination against the strikers. As negotiations advanced on other issues, it became evident that super-seniority was fast becoming the focal point of disagreement. On May 28, the company informed the union that it had decided to award 20 years'[3] additional seniority both to replacements and to strikers who returned to work, which would be available only for credit against future layoffs and which could not be used for other employee benefits based on years of service. The strikers, at a union meeting the next day, unanimously resolved to continue striking now in protest against the proposed plan as well.

---

[3] The figure of 20 years was developed from a projection, on the basis of expected orders, of what the company's work force would be following the strike. As of March 31, the beginning of the strike, a male employee needed seven years' seniority to avoid layoff and a female employee nine years'.

The company made its first official announcement of the super-seniority plan on June 10, and by June 14, 34 new employees, 47 employees recalled from layoff status and 23 returning strikers had accepted production jobs. The union, now under great pressure, offered to give up some of its contract demands if the company would abandon super-seniority or go to arbitration on the question, but the company refused. In the following week, 64 strikers returned to work and 21 replacements took jobs, bringing the total to 102 replacements and recalled workers and 87 returned strikers. When the number of returning strikers went up to 125 during the following week, the union capitulated. A new labor agreement on the remaining economic issues was executed on July 17, and an accompanying settlement agreement was signed providing that the company's replacement and job assurance policy should be resolved by the National Labor Relations Board and the federal courts but was to remain in effect pending final disposition.

Following the strike's termination, the company reinstated those strikers whose jobs had not been filled (all but 129 were returned to their jobs). At about the same time, the union received some 173 resignations from membership. By September of 1959, the production unit work force had reached a high of 442 employees, but by May of 1960, the work force had gradually slipped back to 240. Many employees laid off during this cutback period were reinstated strikers whose seniority was insufficient to retain their jobs as a consequence of the company's super-seniority policy.

The union filed a charge with the National Labor Relations Board alleging that awarding super-seniority during the course of the strike constituted an unfair labor practice and that the subsequent layoff of the recalled strikers pursuant to such a plan was unlawful. The Trial Examiner found that the policy was promulgated for legitimate

economic reasons;[4] not for illegal or discriminatory purposes, and recommended that the union's complaint be dismissed. The Board could not agree with the Trial Examiner's conclusion that specific evidence of subjective intent to discriminate against the union was necessary to finding that super-seniority granted during a strike is an unfair labor practice. Its consistent view, the Board said, had always been that super-seniority, in circumstances such as these, was an unfair labor practice. The Board rejected the argument that super-seniority granted during a strike is a legitimate corollary of the employer's right of replacement under *Labor Board* v. *Mackay Radio & Tel. Co.*, 304 U. S. 333, and detailed at some length the factors which to it indicated that "superseniority is a form of discrimination extending far beyond the employer's right of replacement sanctioned by *Mackay,* and is, moreover, in direct conflict with the express provisions of the Act prohibiting discrimination." Having put aside *Mackay,* the Board went on to deny "that specific evidence of Respondent's discriminatory motivation is required to establish the alleged violations of the Act," relying upon *Radio Officers* v. *Labor Board,* 347 U. S. 17, *Republic Aviation Corp.* v. *Labor Board,* 324 U. S. 793, and *Teamsters Local* v. *Labor Board,* 365 U. S. 667. Moreover, in the Board's judgment, the employer's insistence that its overriding purpose in granting super-seniority was to keep its plant open and

---

[4] The Examiner had relied upon the company's employment records for his conclusion that the replacement program was ineffective until the announcement of the super-seniority awards. The General Counsel, to show that such a plan was not necessary for that purpose, pointed to the facts that the company had 300 unprocessed job applications when the strike ended, that the company declared to the union that it could have replaced all the strikers and that the company did not communicate its otherwise well-publicized policy to replacements before they were hired but only after they accepted jobs.

that business necessity justified its conduct was unacceptable since "to excuse such conduct would greatly diminish, if not destroy, the right to strike guaranteed by the Act, and would run directly counter to the guarantees of Sections 8 (a)(1) and (3) that employees shall not be discriminated against for engaging in protected concerted activities." [5] Accordingly, the Board declined to make findings as to the specific motivation of the plan or its business necessity in the circumstances here.

The Court of Appeals rejected as unsupportable the rationale of the Board that a preferential seniority policy is illegal however motivated.

> "We are of the opinion that inherent in the right of an employer to replace strikers during a strike is the concomitant right to adopt a preferential seniority policy which will assure the replacements some form of tenure, provided the policy is adopted SOLELY to protect and continue the business of the employer. We find nothing in the Act which proscribes such a policy. Whether the policy adopted by the Company in the instant case was illegally motivated we do not decide. The question is one of fact for decision by the Board." 303 F. 2d, at 364.

It consequently denied the Board's petition for enforcement and remanded the case for further findings.

---

[5] In addition, the Board held that continued insistence on this or a similar proposal as a condition to negotiating an agreement constituted a refusal to bargain in good faith under § 8 (a)(5). See *Labor Board* v. *Wooster Division of Borg-Warner*, 356 U. S. 342.

The Board also concluded that on May 29, when the union voted to continue striking in protest against the super-seniority plan, the strike was converted into an unfair labor practice strike. All strikers not replaced at that date, the Board held, were entitled to reinstatement as of the date of their unconditional abandonment of the strike regardless of replacements. See *Labor Board* v. *Pecheur Lozenge Co.*, 209 F. 2d 393.

We think the Court of Appeals erred in holding that, in the absence of a finding of specific illegal intent, a legitimate business purpose is always a defense to an unfair labor practice charge. Cases in this Court dealing with unfair labor practices have recognized the relevance and importance of showing the employer's intent or motive to discriminate or to interfere with union rights. But specific evidence of such subjective intent is "not an indispensable element of proof of violation." *Radio Officers* v. *Labor Board,* 347 U. S. 17, 44. "Some conduct may by its very nature contain the implications of the required intent; the natural foreseeable consequences of certain action may warrant the inference. . . . The existence of discrimination may at times be inferred by the Board, for 'it is permissible to draw on experience in factual inquiries.'" *Teamsters Local* v. *Labor Board,* 365 U. S. 667, 675.

Though the intent necessary for an unfair labor practice may be shown in different ways, proving it in one manner may have far different weight and far different consequences than proving it in another. When specific evidence of a subjective intent to discriminate or to encourage or discourage union membership is shown, and found, many otherwise innocent or ambiguous actions which are normally incident to the conduct of a business may, without more, be converted into unfair labor practices. *Labor Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 46 (discharging employees); *Associated Press* v. *Labor Board,* 301 U. S. 103, 132 (discharging employees); *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177 (hiring employees). Compare *Labor Board* v. *Brown-Dunkin Co.,* 287 F. 2d 17, with *Labor Board* v. *Houston Chronicle Publishing Co.,* 211 F. 2d 848 (subcontracting union work); and *Fiss Corp.,* 43 N. L. R. B. 125, with *Jacob H. Klotz,* 13 N. L. R. B. 746 (movement of plant to another town). Such proof itself is normally sufficient to destroy the em-

ployer's claim of a legitimate business purpose, if one is made, and provides strong support to a finding that there is interference with union rights or that union membership will be discouraged. Conduct which on its face appears to serve legitimate business ends in these cases is wholly impeached by the showing of an intent to encroach upon protected rights. The employer's claim of legitimacy is totally dispelled.[6]

The outcome may well be the same when intent is founded upon the inherently discriminatory or destructive nature of the conduct itself. The employer in such cases must be held to intend the very consequences which foreseeably and inescapably flow from his actions and if he fails to explain away, to justify or to characterize his actions as something different than they appear on their face, an unfair labor practice charge is made out. *Radio Officers* v. *Labor Board, supra*. But, as often happens, the employer may counter by claiming that his actions were taken in the pursuit of legitimate business ends and that his dominant purpose was not to discriminate or to invade union rights but to accomplish business objectives acceptable under the Act. Nevertheless, his conduct *does* speak for itself—it *is* discriminatory and it *does* discourage union membership and whatever the claimed overriding justification may be, it carries with it unavoidable consequences which the employer not only foresaw but which he must have intended. As is not uncommon in human experience, such situations present a complex of motives and preferring one motive to another

---

[6] Accordingly, those cases holding unlawful a super-seniority plan prompted by a desire on the part of the employer to penalize or discriminate against striking employees, *Ballas Egg Products* v. *Labor Board,* 283 F. 2d 871; *Labor Board* v. *California Date Growers Assn.,* 259 F. 2d 587; *Olin Mathieson Chem. Corp.* v. *Labor Board,* 232 F. 2d 158, aff'd *per curiam,* 352 U. S. 1020, are explainable without reaching the considerations present here.

is in reality the far more delicate task, reflected in part in decisions of this Court,[7] of weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner and of balancing in the light of the Act and its policy the intended consequences upon employee rights against the business ends to be served by the employer's conduct.[8]

---

[7] See, e. g., Labor Board v. Mackay Radio & Tel. Co., 304 U. S. 333; Republic Aviation Corp. v. Labor Board, 324 U. S. 793; Labor Board v. Babcock & Wilcox Co., 351 U. S. 105; Labor Board v. Truck Drivers Union, 353 U. S. 87.

[8] In a variety of situations, the lower courts have dealt with and rejected the approach urged here that conduct otherwise unlawful is automatically excused upon a showing that it was motivated by business exigencies. Thus, it has been held that an employer cannot justify the discriminatory discharge of union members upon the ground that such conduct is the only way to induce a rival union to remove a picket line and permit the resumption of business, Labor Board v. Star Publishing Co., 97 F. 2d 465, or rearrange the bargaining unit because of an expected adverse effect on production, Allis-Chalmers Mfg. Co. v. Labor Board, 162 F. 2d 435, or defend a refusal to bargain in good faith on the ground that unless the employer's view prevails dire consequences to the business will follow, Labor Board v. Harris, 200 F. 2d 656, or refuse exclusive recognition to a union for fear that such recognition will bring reprisals from rival unions, McQuay-Norris Mfg. Co. v. Labor Board, 116 F. 2d 748, cert. denied, 313 U. S. 565; Labor Board v. National Broadcasting Co., 150 F. 2d 895, or discriminate in his business operations against employees of rival unions or without union affiliation solely in order to keep peace in the plant and avoid disruption of business, Wilson & Co., Inc., v. Labor Board, 123 F. 2d 411; Labor Board v. Hudson Motor Car Co., 128 F. 2d 528; Labor Board v. Gluek Brewing Co., 144 F. 2d 847; Labor Board v. Oertel Brewing Co., 197 F. 2d 59; Labor Board v. McCatron, 216 F. 2d 212, cert. denied, 348 U. S. 943; Labor Board v. Richards, 265 F. 2d 855. See also Idaho Potato Growers v. Labor Board, 144 F. 2d 295; Cusano v. Labor Board, 190 F. 2d 898; Labor Board v. Industrial Cotton Mills, 208 F. 2d 87, cert. denied, 347 U. S. 935. Indeed, many employers doubtless could conscientiously assert that their unfair labor practices were not malicious but were prompted by their best

This essentially is the teaching of the Court's prior cases dealing with this problem and, in our view, the Board did not depart from it.

The Board made a detailed assessment of super-seniority and, to its experienced eye, such a plan had the following characteristics:

(1) Super-seniority affects the tenure of all strikers whereas permanent replacement, proper under *Mackay,* affects only those who are, in actuality, replaced. It is one thing to say that a striker is subject to loss of his job at the strike's end but quite another to hold that in addition to the threat of replacement, all strikers will at best return to their jobs with seniority inferior to that of the replacements and of those who left the strike.

(2) A super-seniority award necessarily operates to the detriment of those who participated in the strike as compared to nonstrikers.

(3) Super-seniority made available to striking bargaining unit employees as well as to new employees is in effect offering individual benefits to the strikers to induce them to abandon the strike.

(4) Extending the benefits of super-seniority to striking bargaining unit employees as well as to new replacements deals a crippling blow to the strike effort. At one stroke, those with low seniority have the opportunity to obtain the job security which ordinarily only long years of service can bring, while conversely, the accumulated seniority of older employees is seriously diluted. This combination of threat and promise could be expected to undermine the strikers' mutual interest and place

judgment as to the interests of their business. Such good-faith motive itself, however, has not been deemed an absolute defense to an unfair labor practice charge.

the entire strike effort in jeopardy. The history of this strike and its virtual collapse following the announcement of the plan emphasize the grave repercussions of super-seniority.

(5) Super-seniority renders future bargaining difficult, if not impossible, for the collective bargaining representative. Unlike the replacement granted in *Mackay* which ceases to be an issue once the strike is over, the plan here creates a cleavage in the plant continuing long after the strike is ended. Employees are henceforth divided into two camps: those who stayed with the union and those who returned before the end of the strike and thereby gained extra seniority. This breach is re-emphasized with each subsequent layoff and stands as an ever-present reminder of the dangers connected with striking and with union activities in general.

In the light of this analysis, super-seniority by its very terms operates to discriminate between strikers and non-strikers, both during and after a strike, and its destructive impact upon the strike and union activity cannot be doubted. The origin of the plan, as respondent insists, may have been to keep production going and it may have been necessary to offer super-seniority to attract replacements and induce union members to leave the strike. But if this is true, accomplishment of respondent's business purpose inexorably was contingent upon attracting sufficient replacements and strikers by offering preferential inducements to those who worked as opposed to those who struck. We think the Board was entitled to treat this case as involving conduct which carried its own indicia of intent and which is barred by the Act unless saved from illegality by an overriding business purpose justifying the invasion of union rights. The Board concluded that the business purpose asserted was insufficient to insulate

the super-seniority plan from the reach of § 8 (a)(1) and § 8 (a)(3), and we turn now to a review of that conclusion.

The Court of Appeals and respondent rely upon *Mackay* as precluding the result reached by the Board but we are not persuaded. Under the decision in that case an employer may operate his plant during a strike and at its conclusion need not discharge those who worked during the strike in order to make way for returning strikers. It may be, as the Court of Appeals said, that "such a replacement policy is obviously discriminatory and may tend to discourage union membership." But *Mackay* did not deal with super-seniority, with its effects upon all strikers, whether replaced or not, or with its powerful impact upon a strike itself. Because the employer's interest must be deemed to outweigh the damage to concerted activities caused by permanently replacing strikers does not mean it also outweighs the far greater encroachment resulting from super-seniority in addition to permanent replacement.

We have no intention of questioning the continuing vitality of the *Mackay* rule, but we are not prepared to extend it to the situation we have here. To do so would require us to set aside the Board's considered judgment that the Act and its underlying policy require, in the present context, giving more weight to the harm wrought by super-seniority than to the interest of the employer in operating its plant during the strike by utilizing this particular means of attracting replacements. We find nothing in the Act or its legislative history to indicate that super-seniority is necessarily an acceptable method of resisting the economic impact of a strike, nor do we find anything inconsistent with the result which the Board reached. On the contrary, these sources are wholly consistent with, and lend full support to, the conclusion of the Board.

Section 7 [9] guarantees, and § 8 (a)(1) protects from employer interference the rights of employees to engage in concerted activities, which, as Congress has indicated, H. R. Rep. No. 245, 80th Cong., 1st Sess. 26, include the right to strike. Under § 8 (a)(3), it is unlawful for an employer by discrimination in terms of employment to discourage "membership in any labor organization," which includes discouraging participation in concerted activities, *Radio Officers* v. *Labor Board,* 347 U. S. 17, 39–40, such as a legitimate strike. *Labor Board* v. *Wheeling Pipe Line, Inc.,* 229 F. 2d 391; *Republic Steel Corp.* v. *Labor Board,* 114 F. 2d 820. Section 13 [10] makes clear that although the strike weapon is not an unqualified right, nothing in the Act except as specifically provided is to be construed to interfere with this means of redress, H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 59, and § 2 (3) [11] preserves to strikers their unfilled positions and status as employees during the pendency of a strike. S. Rep. No. 573, 74th Cong., 1st Sess. 6.[12]  This repeated solicitude for

---

[9] "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8 (a)(3)."

[10] "Nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right."

[11] "The term 'employee' . . . shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment . . . ."

[12] This concern for the maintenance of the status prevailing before the strike has had its most recent manifestation in the 1959 amend-

the right to strike is predicated upon the conclusion that a strike when legitimately employed is an economic weapon which in great measure implements and supports the principles of the collective bargaining system.[13]

While Congress has from time to time revamped and re-directed national labor policy, its concern for the integrity of the strike weapon has remained constant. Thus when Congress chose to qualify the use of the strike, it did so by prescribing the limits and conditions of the abridgment in exacting detail, e. g., §§ 8 (b)(4), 8 (d), by indicating the precise procedures to be followed in effecting the interference, e. g., § 10 (j), (k), (l); §§ 206–210, Labor Management Relations Act, and by preserving the positive command of § 13 that the right to strike is to be given a

ments to the National Labor Relations Act. Congress there withdrew the ban inserted by the Taft-Hartley amendment disqualifying replaced strikers from voting in union elections. Now, employees not entitled to reinstatement can, under regulations promulgated by the Board, exercise their pre-strike voting rights. See § 9 (c)(3); S. Rep. No. 187, 86th Cong., 1st Sess. 32–33.

[13] "Labor unions . . . were organized out of the necessities of the situation. A single employee was helpless in dealing with an employer. He was dependent ordinarily on his daily wage for the maintenance of himself and family. If the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and to resist arbitrary and unfair treatment. Union was essential to give laborers opportunity to deal on equality with their employer. They united to exert influence upon him and to leave him in a body in order by this inconvenience to induce him to make better terms with them. They were withholding their labor of economic value to make him pay what they thought it was worth. The right to combine for such a lawful purpose has in many years not been denied by any court. The strike became a lawful instrument in a lawful economic struggle or competition between employer and employees as to the share or division between them of the joint product of labor and capital."

American Steel Foundries v. Tri-City Council, 257 U. S. 184, 209, quoted in Staff Report of Senate Committee on Education and Labor, 74th Cong., 1st Sess., Comparison of S. 2926 (73d Cong.) and S. 1958

generous interpretation within the scope of the labor Act. The courts have likewise repeatedly recognized and effectuated the strong interest of federal labor policy in the legitimate use of the strike. *Automobile Workers* v. *O'Brien,* 339 U. S. 454; *Amalgamated Assn. of Elec. Ry. Employees* v. *Wisconsin Employment Rel. Bd.,* 340 U. S. 383; *Labor Board* v. *Remington Rand, Inc.,* 130 F. 2d 919; *Cusano* v. *Labor Board,* 190 F. 2d 898; cf. *Sinclair Ref. Co.* v. *Atkinson,* 370 U. S. 195.

Accordingly, in view of the deference paid the strike weapon by the federal labor laws and the devastating consequences upon it which the Board found was and would be precipitated by respondent's inherently discriminatory super-seniority plan, we cannot say the Board erred

---

(74th Cong.) 20. See also, Remarks of Senator Wagner before Senate Committee on Education and Labor, 73d Cong., 2d Sess., Hearings on S. 2926, 10–11:

"It has been urged that the bill places a premium on discord by declaring that none of its provisions shall impair the right to strike. On the contrary, nothing would do more to alienate employee cooperation and to promote unrest than a law which did not make it clear that employees could refrain from working if that should become their only redress."

Remarks of Senator Taft, 93 Cong. Rec. 3835 (1947):

"That means that we recognize freedom to strike when the question involved is the improvement of wages, hours, and working conditions, when a contract has expired and neither side is bound by a contract. We recognize that right in spite of the inconvenience, and in some cases perhaps danger, to the people of the United States which may result from the exercise of such right. . . . We have considered the question whether the right to strike can be modified. I think it can be modified in cases which do not involve the basic question of wages, prices, and working conditions. . . . So far as the bill is concerned, we have proceeded on the theory that there is a right to strike and that labor peace must be based on free collective bargaining. We have done nothing to outlaw strikes for basic wages, hours, and working conditions after proper opportunity for mediation."

in the balance which it struck here. Although the Board's decisions are by no means immune from attack in the courts as cases in this Court amply illustrate, *e. g., Labor Board* v. *Babcock & Wilcox Co.,* 351 U. S. 105; *Labor Board* v. *United Steelworkers,* 357 U. S. 357; *Labor Board* v. *Insurance Agents,* 361 U. S. 477, its findings here are supported by substantial evidence, *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474, its explication is not inadequate, irrational or arbitrary, compare *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 196–197; *Labor Board* v. *United Steeworkers, supra,* and it did not exceed its powers or venture into an area barred by the statute. Compare *Labor Board* v. *Insurance Agents, supra.* The matter before the Board lay well within the mainstream of its duties. It was attempting to deal with an issue which Congress had placed in its hands and "where Congress has in the statute given the Board a question to answer, the courts will give respect to that answer." *Labor Board* v. *Insurance Agents, supra,* at 499. Here, as in other cases, we must recognize the Board's special function of applying the general provisions of the Act to the complexities of industrial life, *Republic Aviation Corp.* v. *Labor Board,* 324 U. S. 793, 798; *Phelps Dodge Corp.* v. *Labor Board, supra,* at 194, and of "[appraising] carefully the interests of both sides of any labor-management controversy in the diverse circumstances of particular cases" from its special understanding of "the actualities of industrial relations." *Labor Board* v. *United Steelworkers, supra,* at 362–363. "The ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." *Labor Board* v. *Truck Drivers Union,* 353 U. S. 87, 96.

Consequently, because the Board's judgment was that the claimed business purpose would not outweigh the

necessary harm to employee rights—a judgment which we sustain—it could properly put aside evidence of respondent's motive and decline to find whether the conduct was or was not prompted by the claimed business purpose. We reverse the judgment of the Court of Appeals and remand the case to that court since its review was a limited one and it must now reach the remaining questions before it, including the propriety of the remedy which at least in part turns upon the Board's construction of the settlement agreement as being no barrier to an award not only of reinstatement but of back pay as well.[14]

*Reversed and remanded.*

MR. JUSTICE HARLAN, concurring.

I agree with the Court that the Board's conclusions respecting this 20-year "superseniority" plan were justified without inquiry into the respondents' motives. However, I do not think that the same thing would necessarily be true in all circumstances, as for example with a plan providing for a much shorter period of extra seniority. Being unsure whether the Court intends to hold that the Board has power to outlaw *all* such plans, irrespective of the employer's motives and other circumstances, or only to sustain its action in the particular circumstances of *this* case, I concur in the judgment.

---

[14] "We do not agree with Respondent's contention that the Union in its strike settlement agreement of July 17 waived all rights for these employees. The settlement agreement provided, *inter alia:* 'The Company's replacement and job assurance policy to be resolved by the NLRB and the Federal Courts and to remain in effect pending final disposition.' It is clear that this agreement was intended merely as an interim settlement pending legal determination of the employees' rights. In any event, we would not in our discretion honor a private settlement which purported to deny to employees the rights guaranteed them by the Act. Cf. *Wooster Division of Borg-Warner Corporation,* 121 NLRB 1492, 1495." *Erie Resistor Corp.,* 132 N. L. R. B. 621, 631 n. 31.