### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### LOCAL 294, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, INDEPENDENT, Respondent.

### No. 234, Docket 27825.

United States Court of Appeals Second Circuit.

Argued Jan. 29, 1963.

Decided May 21, 1963.

---

Allison W. Brown, Jr., Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallett-Prevost, Asst. Gen. Counsel, Gladys Kessler, atty., N. L. R. B.), for petitioner.

Harry Pozefsky, Gloversville, N. Y., for respondent.

Before LUMBARD, Chief Judge, HAYS, Circuit Judge, and DIMOCK, District Judge.

HAYS, Circuit Judge.

The National Labor Relations Board petitions for enforcement of an order based upon a finding that respondent engaged in unfair labor practices in violation of Section 8(b) (1) (A) and Section 8(b) (2) of the National Labor Relations Act (29 U.S.C. § 158(b) (1) (A) and (b) (2)). We deny enforcement on the ground that the activities in which the respondent engaged were not unfair labor practices within the meaning of the Act.

We accept the Board's findings of fact with one minor exception which we will indicate later.[1]

The findings present the following situation:

George Monty was employed from time to time as an "extra" driver by the Valetta Motor Trucking Co., Inc., a company engaged in general trucking between terminals in Vestal, New York and Boston, Massachusetts. Monty worked at the company's terminal in Albany, New York, which is a transfer point on its Vestal-Boston route.

Monty began to work for the company in December, 1959, taking out "extra" runs when the number of runs was greater than could be handled by the regular drivers or when one of the regular drivers did not report for work. The company had four regular drivers and two extra drivers besides Monty. All of the drivers, regular and extra, were members of respondent union which had a collective agreement with the company covering the work of the drivers.

From the time of his original employment in December, 1959 until some time in the fall of 1960 Monty had "priority" on the extra runs, i. e. he was assigned to the first run for which an extra driver was needed. If further help was required one or both of the other two extra drivers was then called upon.

In the fall of 1960 the two extra drivers other than Monty began to be assigned to runs ahead of Monty and Mon-

1. See note 5, infra.

ty's work dropped from an average of approximately one and one half trips a week to little more than one a week in November and less than one a week in December. In January 1961 Monty stopped reporting for work with the company.

When Monty's work began to fall off he complained to the Company and was assured that he was to have priority. Instructions to that effect were given to the dispatcher (who was also one of the regular drivers and the union steward). Monty also complained to his union steward who accompanied him to the union hall where he presented his complaint to a committee composed of union officials and members. At this meeting the business agent of the union said to the union steward who was presenting Monty's case, "We tried to keep this job open where a man out of work can pick up a few days' work now and then."

Nothing came of Monty's complaint to the union and he again complained to the company. The dispatcher was informed that if Monty was not given preference the Albany stop would be canceled, and the company did run several trucks straight through from Vestal to Boston without stopping at Albany to change drivers. When the union lodged a complaint against this practice the subject of Monty's priority again came up and union officials argued that Monty was a "trouble maker" and "no good", and that there were plenty of other reliable men whom the company could employ.

On the basis of this evidence the Board concluded that the union violated Section 8(b) (2) of the Act by causing the company to discriminate against Monty in violation of Section 8(a) (3).

The Board's order requires respondent to cease and desist from causing or attempting to cause the company to discriminate against Monty and to make Monty whole for any loss of pay he has suffered by reason of discrimination. The order also requires respondent to notify the company that it withdraws its objection to Monty's being given priority in employment and to post appropriate notices in its office.

■ We hold that this evidence fails to establish any violation of Section 8(b) (1) (A) or 8(b) (2) of the Act.

■ The union does not commit an unfair labor practice merely because it causes or attempts to cause an employer to promote or demote an employee or to discriminate for or against him. In Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), discrimination in seniority which was adopted at the behest of the union was found unexceptionable.[2] In Aeronautical Industrial District Lodge 727 v. Campbell, 337 U.S. 521, 69 S.Ct. 1287, 93 L.Ed. 1513 (1949), the Court gave its approval to super-seniority for union officials which was, of course, a practice proposed by the union. Local 357, International Brotherhood of Teamsters, etc. v. N. L. R. B., 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed. 2d 11 (1961), held that it was not an unfair labor practice for a union to cause the discharge of an employee because he was hired ahead of other men to whom the union had assigned preference. See also Alvado v. General Motors Corp., 303 F.2d 718 (2d Cir.), cert. denied, 371 U.S. 925, 83 S.Ct. 293, 9 L.Ed.2d 233 (1962).

Decisions of the Board which hold that discrimination at the instance of the union is not *per se* an unfair labor practice include Matter of Yonkers Contracting Co., 135 NLRB 865 (1962), where the union induced the employer to hire one man rather than another[3]; Matter of

---

2. "Our decision interprets the statutory authority of a collective-bargaining representative to have such breadth that it removes all ground for a substantial charge that [the union], by exceeding its authority, committed an unfair labor practice." 345 U.S. at 332, footnote 4, 73 S.Ct. at 683, 97 L.Ed. 1048.

3. "The question, therefore, is whether it was unlawful for the Respondent to request the Company to prefer an employee, such as Burrows, who was part of a crew which was about to be laid off, over an outside applicant, such as Backus. We think the answer is clear. It is a union's function to attempt to ob-

Wilputte Coke Oven Division, Allied Chemical Corp., 135 NLRB 323 (1962) and Matter of Plaza Builders, Inc., 134 NLRB 751 (1961), where the union prevailed upon the employers to lay-off employees because they were "out-of-town" men.

These authorities establish the principle that a union does not violate Section 8(b) (2) unless the discrimination which the union seeks would constitute a violation of Section 8(a) (3) if the employer acted without union suggestion or compulsion.[4]  Section 8(b) (2) is violated only by causing or attempting to cause "an employer to discriminate against an employee in violation of [Section 8(a) (3)]".  An employer who discriminates among employees does not violate Section 8(a) (3) unless the discrimination is based upon union membership or other union-connected activities. It is obvious, for example, that the em-

ployer's promotion or the demotion of an employee who is a union official is not a violation of the Act unless the discrimination for or against him is based on his union activity.  It seems to us to be equally obvious that the union's seeking such a promotion or demotion would not constitute an unfair labor practice if the union's action was based upon the employee's merit or demerit and was unconnected with his union membership or activity.

In the present case there is no evidence in the record which suggests that the union was motivated by considerations having to do with Monty's union membership or activity.  The board's brief says: "the reason for the Union's action, concededly is not altogether clear".  The reasons suggested by the record include the statements of the Union's business agent that "we tried to keep this job open where a man out of work can pick up a few days' work now and then"[5]

tain benefits for the employees it represents.  Here the Respondent was performing that function by inducing the employer to fill desirable new jobs from within the working force rather than by hiring from outside.  Although this might encourage union membership, it would be the type of encouragement the Supreme Court was referring to when it stated in Local 357, International Brotherhood of Teamsters, etc. v. N. L. R. B. (365 U.S. 667, 675–676, 81 S.Ct. 835): 'The truth is that the union is a service agency that probably encourages membership whenever it does its job well.'  Finding a violation in this case would penalize the Respondent for attempting to preserve job opportunities for the unit employees it represented.  Such a finding would mean that a union could not attempt to improve general working conditions for the employees in the unit if, by such an attempt, a job applicant might be temporarily injured.  The Respondent here prevailed upon the Company not to hire an outside applicant, who was also a union member, when a present employee was about to be laid off.  Clearly, this was an attempt by the Respondent to perform its obligation of representing the employees.  We find that such action in this case does not involve unlawful encouragement of union membership within the meaning of Section 8(a) (3) or 8 (b) (2) of the Act.  Cf. Local 357, Teamsters, supra." 135 N.L.R.B. at 866.

4. A majority of the Board has recently reached the novel conclusion that, under the general principle laid down in Steele v. Louisville & N. R. R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), a union violates the Act if it seeks unfair discrimination, even if that discrimination is not based on union membership or activity.  Matter of Miranda Fuel Company, Inc., 140 N.L.R.B. No. 7 (1962).  There is nothing in the record of the present case which would indicate that the discrimination against Monty was unfair in the Steele sense, and the Board has made no finding on the point.  We therefore express no opinion on this possible exception to the principle stated in the text.

5. The Board states that this reason for preferring Monty over the other extra employees was a "pretext".  There is no evidence in the record to support such a conclusion and the Trial Examiner apparently did not consider it a pretext since he said in his Intermediate Report:
   "Smith's explanation to Covey, at the union office, and in the presence of Monty and the Union's president, for keeping the job open for men out of work rather than recognizing Monty's prior right constituted a decision by the superior union representative to Covey as steward which Covey as company representative did not ignore."

and that Monty was "no good" and "a troublemaker".

Since, if the employer had, *sua sponte*, reduced Monty's priority on the ground of providing jobs for others, or on the ground that he was no good or a troublemaker, he would have committed no unfair labor practice under Section 8(a)(3), we fail to see how the union could commit an unfair labor practice by inducing that action.

But it is argued that since the union influenced or dictated the employer's action in withdrawing Monty's priority, that action encouraged union membership. The proposition is advanced that Section 8(b)(2) is violated because the display of the union's power over the priority status of employees demonstrates the advantages of such membership. This theory, arising from too broad a reading of Radio Officers' Union of Commercial Telegraphers Union v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954), has been completely rejected by the Supreme Court in Local 357, International Brotherhood of Teamsters, etc. v. N. L. R. B., 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961) and N. L. R. B. v. News Syndicate Co., 365 U.S. 695, 81 S.Ct. 849, 6 L.Ed.2d 29 (1961) which held that provisions for union control over hiring and job requirements were not violative of the Act. See also Local 553, International Brotherhood of Teamsters, etc. v. N. L. R. B., 366 U.S. 763, 81 S.Ct. 1670, 6 L.Ed.2d 853 (1961) (union control over seniority).

In Local 357, International Brotherhood of Teamsters, etc. v. N. L. R. B., the Court held that the establishment of a hiring hall under the union's exclusive control was not a violation of the Act. The very basis of the administration of a union controlled hiring hall involves discrimination since employees are referred in accordance with some type of listed priorities. As we have pointed out the employee involved in the Teamsters' case, whose discharge was held not violative of the Act, was discharged because he had been hired out of the turn to which the union assigned him. But, as the Court clearly held, this discrimination, so long as it is not based upon union membership, is not "the kind of discrimination to which the Act is addressed", and is not violative of the Act merely because the union's power encourages union membership.[6]

"It may be that the very existence of the hiring hall encourages union membership. We may assume that it does. The very existence of the union has the same influence. When a union engages in collective bargaining and obtains increased wages and improved working conditions, its prestige doubtless rises and, one may assume, more workers are drawn to it. When a union negotiates collective bargaining agreements that include arbitration clauses and supervises the functioning of those provisions so as to get equitable adjustments of grievances, union membership may also be encouraged. The truth is that the union is a service agency that probably encourages membership whenever it does its job well." 365 U.S. at 675–676, 81 S.Ct. at 839–840, 6 L.Ed.2d 11.

---

6. Contrary to what is stated in the concurring opinion, we do not hold or suggest that the union's action in the present case was not intended to or did not have the effect of encouraging union membership. The purpose of our discussion of Local 357, etc. v. N. L. R. B. is to indicate that in the absence of discrimination based upon union membership or activity it is irrelevant that the union's action had the effect of encouraging union membership. This is the purport, as we see it, of the quotation which we have included from the opinion of Mr. Justice Douglas. Our concurring colleague's addition to that quotation serves further to emphasize the very point for which we cite the case.

We are not in disagreement with our colleague in his interpretation of the Radio Officers' case, but we fail to see how that case is useful on the issues involved in the present case, since the discrimination there was based on union membership or activity. See also N. L. R. B. v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963).

Union-administered hiring halls do not violate the Act by refusing referral on the ground that others out of work longer should be referred first (actually a frequent ground for preference) or on the ground that an applicant is "no good" or "a troublemaker". Referral by the union violates the Act only when there is discrimination based upon union membership or union activity.

The conclusion of the Board that an employer commits an unfair labor practice if he changes an employee's conditions of employment at the instance of the union, is not only contrary to the letter and spirit of the Act and to the precedents, but is based on a view of labor-management policy which is certain to have untoward consequences. There are countless situations in which the very concept of collective action demands that unions have the power to influence the employer to make changes in the job status of individual employees. To hold that unions cannot properly press upon an employer their demands for an employee's advancement or demotion would be to weaken greatly the union's effectiveness in representing all the employees in a unit. The policy of the Board is all the more mistaken if it is based upon disapproval of the union's motives in the instant case. Not only is the Board without authority to pass upon the wisdom or the desirability of a union's actions as long as those actions are not forbidden by the Act, but the principle applied by the Board would be equally applicable to actions which are clearly beneficial to the majority of employees. See Ford Motor Co. v. Huffman, and Aeronautical Industrial District Lodge 727 v. Campbell, supra.

Since the Board's finding of a violation of Section 8(b) (1) (A) is merely adjunctive to its finding of a violation of Section 8(b) (2), the former must fall with the latter. Moreover considered as an independent finding its enforcement is prevented by N. L. R. B. v. Drivers, etc., Local Union 639, 362 U.S. 274, 80 S.Ct. 706, 4 L.Ed.2d 710 (1960).

Enforcement denied.

DIMOCK, District Judge (concurring).

To support the Board's order the employer's act must have constituted discrimination and there must have been intention that it encourage union membership. The majority hold that neither element was present. I agree with the holding that there was no discrimination within the intent of the Act but disagree with the holding that there was no intention that the employer's act should encourage union membership. Since I agree that proof of both elements is necessary if the Board's order is to be enforced, I concur in the result of the majority decision that enforcement should be denied.

Taking up discrimination, we find that Mr. Justice Clark's dissent in Local 357, etc. v. N. L. R. B., 365 U.S. 667, at p. 689, 81 S.Ct. 835, at p. 846, 6 L.Ed.2d 11, makes it clear that the case holds "that there can be no 'discrimination' within the section *unless it is based on* union membership, i. e., members treated one way, nonmembers another, with further distinctions, among members, based on good standing." To this I would add the gloss that there *may* be discrimination within the meaning of Section 8 if it is based on *alleged* lack of good standing, as in Radio Officers Union, etc. v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455. It is clear here, however, that the "discrimination" was not based on union membership and was therefore not within the Section.

On the question of intent to encourage union membership, Section 8(a) (3) of the Act provides that it shall be an unfair labor practice for an employer "by discrimination * * * to encourage * * * membership in any labor organization" and Section 8(b) (2) makes it an unfair labor practice for a labor organization "to cause * * * an employer to discriminate * * * in violation of subsection (a) (3) of this section". The Supreme Court said in the Radio Officers case, 347 U.S. at page 52, 74 S.Ct. at page 342, 98 L.Ed. 455, "Both Boston and Fowler were denied jobs by

employers solely because of the unions' actions. Since encouragement of union membership is obviously a natural and foreseeable consequence of any employer discrimination at the request of a union, those employers must be presumed to have intended such encouragement." I interpret this as meaning that, if the act of the employer is in response to a request of the union, no further proof of his intention to encourage is needed.

The majority opinion states that it is an established "principle that a union does not violate Section 8(b) (2) unless the discrimination which the union seeks would constitute a violation of Section 8 (a) (3) if the employer acted without union suggestion or compulsion". This denies the correctness of my interpretation of the Radio Officers case as holding that the fact that the employer's act is in compliance with the union's suggestion supplies the proof of the employer's intention to encourage union membership which might otherwise be absent.

I cannot agree with the statement of the majority that my interpretation of Radio Officers was rejected in Local 357, etc. v. N. L. R. B., 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11, supra, and N. L. R. B. v. News Syndicate Co., 365 U.S. 695, 81 S.Ct. 849, 6 L.Ed.2d 29.

As I read the Teamsters Local 357 case the court not only did not reject the theory that a union's success in getting an employee to accede to its requests encouraged union membership but expressly assumed that it encouraged union membership. What the case held was that, assuming that there was encouragement of union membership, there was no discrimination. This clearly appears if one reads on from the point where the quotation from that case in the majority opinion stops. The majority's quotation, with the discussion of discrimination added, appears below.

"It may be that the very existence of the hiring hall encourages union membership. We may assume that it does. The very existence of the union has the same influence. When a union engages in collective bar-

gaining and obtains increased wages and improved working conditions, its prestige doubtless rises and, one may assume, more workers are drawn to it. When a union negotiates collective bargaining agreements that include arbitration clauses and supervises the functioning of those provisions so as to get equitable adjustments of grievances, union membership may also be encouraged. The truth is that the union is a service agency that probably encourages membership whenever it does its job well. But, as we said in Radio Officers [etc.] v. [N. L. R. B.] Labor Board, supra, the only encouragement or discouragement of union membership banned by the Act is that which is 'accomplished by discrimination.' P. 43.

\*   \*   \*   \*   \*   \*

"The present agreement for a union hiring hall has a protective clause in it, as. we have said; and there is no evidence that it was in fact used unlawfully. We cannot assume that a union conducts its operations in violation of law or that the parties to this contract did not intend to adhere to its express language. Yet we would have to make those assumptions to agree with the Board that it is reasonable to infer the union will act discriminatorily." 365 U.S. pp. 675–676, 81 S.Ct. pp. 839–840, 6 L.Ed.2d 11.

The basis of the Teamsters Local 357 decision thus was that the employer's acceptance of the union hiring hall system was not necessarily, as the court expressed it elsewhere, 365 U.S. on page 675, 81 S.Ct. on page 839, 6 L.Ed.2d 11, "the kind of discrimination to which the Act is addressed."

The opinion in the other case which the majority cite as repudiating my interpretation of the Radio Officers holding, N. L. R. B. v. News Syndicate Co., 365 U.S. 695, 81 S.Ct. 849, 6 L.Ed.2d 29, dealt solely with discrimination. It made no attempt to attack the propositions that union success in getting its

requests granted by an employer encourages union membership and that the employer, in acceding to the requests, must be presumed to have intended the natural consequences of his acts.

Since, however, I agree with the majority that the "discrimination" here was not based on union membership or union standing and thus not "the kind of discrimination to which the Act is addressed," I reach their result in spite of the fact that I disagree with their conclusion that the mere fact that the employer's discrimination is in response to a union's request is insufficient evidence that the discrimination is "to encourage * * * membership in any labor organization."