NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LOCAL 50, AMERICAN BAKERY &
CONFECTIONERY WORKERS UN-
ION, AFL–CIO, Respondent.

No. 96, Docket 28691.

United States Court of Appeals
Second Circuit.

Argued Oct. 22, 1964.

Decided Nov. 24, 1964.

Friendly, Circuit Judge, dissented.

Stephen B. Goldberg, N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Melvin J. Welles, Allen M. Hutter, Washington, D. C., on the brief), for petitioner.

Howard N. Meyer, of O'Dwyer & Bernstien, New York City, for respondent.

Before FRIENDLY, KAUFMAN and ANDERSON, Circuit Judges.

KAUFMAN, Circuit Judge:

We are called upon here to decide whether certain union action caused an employer to make a "discriminatory" decision, the ultimate effect of which was to "encourage" or "discourage" union membership. The problem is before us on the National Labor Relations Board's petition for enforcement of its order, based upon a trial examiner's findings and conclusions that Local 50, American Bakery & Confectionery Workers Union, AFL-CIO (the Union), violated Section 8(b) (2) and (1) (A) of the National Labor Relations Act, 29 U.S.C. §§ 158 (b) (2), 158(b) (1) (A), by causing Ward Baking Company to refuse to reinstate Charles Fisher on the ground that

he had procured a withdrawal card from the Union.

Section 8(b) (2) makes it an unfair labor practice for a union "to cause or attempt to cause an employer" to violate Section 8(a) (3) "by discrimination in regard to hire or tenure of employment * * * [which] encourage[s] or discourage[s] membership in any labor organization." Section 8(b) (1) (A) bars unions from restraining or coercing workers in the exercise of Section 7 rights, including the right to refrain from union activities. The Board's order, which we enforce, contains the usual cease and desist and notice provisions, as well as a requirement for back pay.

The sequence of events leading to the present proceeding commenced September 1, 1963, when the Union called a strike at Ward's Bronx plant to protest the management's decision to transfer bread and doughnut production to a New Jersey unit. Fisher, who had been employed at the Bronx plant for almost thirty years, was a Union member, and, as such, joined the strike and picketed for some time. On September 22, however, while the Bronx strike was still in progress, he successfully sought work at Ward's Newark plant—a separate bargaining unit represented by the Union's sister local, Number 84. At that time, he was told by Ward's Newark personnel manager that his Newark job was "temporary" and that he could return to his position in the Bronx when the strike ended.

Despite his "temporary" status, however, Fisher was soon requested to join and pay dues to Local 84. Accordingly, on October 29 Fisher sought and obtained a withdrawal card from the Union, ostensibly so that he might transfer his membership to the Newark local and avoid paying a new initiation fee.

On November 7, the Bronx strike ended, and Ward's Bronx personnel manager, John F. McGuire, met with Union representatives on the following day to arrange the order of recall of workers. Since the bread and doughnut departments had been permanently terminated, the Union and employer conferees faced a complex problem; senior employees in those departments would have to be assigned other jobs. In light of this fact, and since only about 60 of the approximately 450 employees in the Bronx plant were to be recalled immediately, the parties at the November 8 conference decided to consult a consolidated plant-wide seniority list in determining the order of recall.

With this *modus operandi* agreed upon, Fisher's name was reached in due course at number thirty-five on the seniority list. At this point, Louis Genuth, the Union's secretary-treasurer, advised McGuire that Fisher "had taken a transfer card and * * * was not entitled to recall." As a result of this advice, McGuire scratched Fisher's name from the list, and he was accordingly not rehired.

News of this action did not immediately reach Fisher, and when he was discharged from his Newark job, sometime during the following week, he went to the Bronx plant, seeking reinstatement. It was at this juncture that McGuire advised him that Ward was ready and willing to rehire him, but that the Union had objected.[1] Although Fisher subsequently sought to persuade Union officials to withdraw their objections to his recall, he was finally told that he was no longer a member of the Union and hence out of a job.

The Union does not seriously challenge the foregoing summary of relevant facts, as found by the trial examiner. Rather, in an attempt to justify its conduct, the Union points to a provision of the collective bargaining agreement specifying that seniority rights would terminate if an employee "voluntarily quit." Relying on this provision, the Union contends that Fisher in fact had terminated his

---

1. To ensure that Ward would continue to abide by Genuth's instructions, the Union's shop steward and one of its business agents separately told McGuire, within the next few days, that Fisher was not to be reinstated because he had received a withdrawal card.

employment at the Bronx plant when he received a withdrawal card on October 29.

■ At the outset, we are able to dismiss several of the Union's contentions without extensive discussion. Thus, we cannot attach the requested significance to a provision in the Union's international constitution and bylaws that "a .withdrawal card shall signify that the member has voluntarily withdrawn from his local's rolls of active members and has withdrawn from holding or seeking employment within the work or geographic jurisdiction of this International or his local union." As the trial examiner correctly found, this provision had not become a part of the contract between Ward and the Union, either by direct incorporation or by custom and practice.

■ Neither can we accept the Union's suggestion that its opposition to Fisher's reinstatement was motivated by his alleged statement, in securing the withdrawal card, that he had "quit" the Bronx plant. The trial examiner, having observed the witnesses, did not credit the testimony supporting this theory, and we find his conclusion on this score supported by substantial evidence on the record as a whole. See Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).[2]

■ The difficult issue for our determination is whether Fisher's loss of seniority involved the sort of "discrimination" which "encourages" membership in a labor organization within the meaning of Sections 8(b) (2) and 8(a) (3). Our guidelines for resolving these questions are taken from N. L. R. B. v. Local 294, I. B. T., 317 F.2d 746 (2d Cir. 1963), where Judge Hays wrote that a union does not violate 8(b) (2) unless the "discrimination" which it seeks would constitute a violation of 8(a) (3) if the employer acted without suggestion or compulsion. See also N. L. R. B. v. Local 776, IATSE (Film Editors), 303 F.2d 513, 516 (9th Cir. 1962).

■ We must first determine, therefore, whether Ward "discriminated" against Fisher by refusing to reinstate him. Central to such an inquiry is a proper definition of the sort of "discrimination" which the Act prohibits. Stated concisely, we believe that an employee is unlawfully "discriminated" against when a distinction is made arbitrarily or without sound basis and to his detriment. See N. L. R. B. v. Miranda Fuel Co., 326 F.2d 172, 181 (2d Cir. 1963) (Friendly, J., dissenting). It is clear to us, moreover, that the provisions of the Labor Act under consideration are meaningful only if they are read to forbid such "discrimination" not only between union members and non-members or between good members and bad members but in all decisions which depend primarily upon union membership consideration. Cf. Local 357, I. B. T. v. N. L. R. B., 365 U.S. 667, 682, 81 S.Ct. 835, 6 L.Ed.2d 11 (Harlan, J., concurring).

■ When viewed in this context, we believe that the Board was well within the province of its expertise in drawing the inference that an unlawful form of "discrimination" was practiced. See N. L. R. B. v. Erie Resistor Corp., 373 U.S. 221, 227, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). It is readily apparent to us that Fisher lost his job because the Union caused Ward to enforce a Union rule that was not incorporated in the collective bargaining agreement; his employment

---

2. There was testimony, for example, that the Union's representatives clearly stated to Personnel Manager McGuire that Fisher's ineligibility for recall stemmed from his request for and receipt of a withdrawal card and nothing else. Moreover, it was undisputed that Fisher did not, before or after the November 8 meeting, inform Ward's Bronx management that he was terminating his employment at that plant. Indeed, McGuire testified that he first learned that Fisher was working in Newark from Genuth, the Union's secretary-treasurer, at the November 8 conference. Finally, Fisher himself testified that he had not been informed that the acquisition of a withdrawal card signified his intention to leave either his job or the Union.

would not have terminated without the Union's pressure and cajoling. These acts, it seems to us, establish that Ward's conduct, resulting from the Union's causation, was arbitrary and without sound basis.

The Union directs our attention to a number of recent cases which it asserts support its position. See Local 357, I. B. T. v. N. L. R. B., 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961) (hiring halls); Cafero v. N. L. R. B., 336 F.2d 115 (2d Cir. Aug. 27, 1964) (moonlighting); N. L. R. B. v. Miranda Fuel Co., 326 F.2d 172 (2d Cir. 1963) (violation of leave provisions); N. L. R. B. v. Local 294, I. B. T., 317 F.2d 746 (2d Cir. 1963) (work rotation rules). But in our opinion such decisions are not apposite. There is a vital distinction between this case, where the Union's withdrawal card rules were not incorporated in the collective bargaining agreement with Ward, and the cited cases, where Union and employer actions were predicated upon express contract provisions. Indeed, in Local 357, supra, the contract specifically provided that there would be no discrimination against employees because of the presence or absence of union membership.

It is of interest that basic to the National Labor Relations Act is an overriding policy to insulate employees' jobs from their organizational rights. To achieve this goal, Sections 8(a) (3) and 8(b) (2) were designed to allow workers to exercise freely their right to join unions, to be good, bad, or indifferent members, or to abstain from joining any union without imperiling their right to a livelihood. Radio Officers' Union v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954). This is not to say that the Union could not have punished

Fisher for circumventing the withdrawal card rules by taking appropriate intra-union disciplinary action. But Fisher's job was shielded from his obligations to the Union, with but a single exception. Thus, the statute explicitly states that a Union commits an unfair labor practice when it causes an employer to discriminate against an employee "on some ground *other than* his failure to tender the periodic dues and initiation fees uniformly required * * *." 29 U.S.C. § 158(b) (2). (Emphasis added.) Here there is no question but that Fisher's dues were current.[3]

Finally, it seems to us that the Board could reasonably conclude that Ward, by *refusing to reinstate* Fisher, was under the foregoing circumstances "encouraging" union membership. See Radio Officers' Union v. N. L. R. B., 347 U.S. 17, 51, 74 S.Ct. 323, 98 L.Ed. 455 (1951). It has long been clear that specific proof of intent to encourage union membership is unnecessary where the employer's conduct inherently has such effects. Radio Officers', supra, 347 U.S. at 45, 74 S.Ct. 323. We cannot say that it was unreasonable for the Board to conclude, especially in light of its expertise in labor disputes,[4] that Ward's subservience to the Union in refusing to reinstate Fisher because he had secured a withdrawal card would serve in the future to encourage fellow workers to remain *active* Union members during a strike and to discourage transfers to sister locals.

Several additional contentions by the Union require brief discussion. We are told that Local 294, supra, and Miranda Fuel, supra, compelled the Board to carry the burden of proving the Union's illegal motivation. From this premise, the Union argues that it did not intend to cause

---

3. If Fisher had fallen behind in dues payments to Local 50 while working in Newark, the first proviso of § 8(a) (3) might, as the dissent suggests, be applicable. But that situation is not before us; the proviso speaks of failing to tender periodic dues payments, and not in terms of suspending a future "obligation" to pay dues.

4. "The Board knows the facts of life in the labor world better than we ever can; we ought not upset its conclusion as to 'encouragement' unless we can say this is without rational basis." N. L. R. B. v. Miranda Fuel Co., 326 F.2d 172, 184 (Friendly, J., dissenting).

forbidden discrimination because it honestly believed Fisher had "quit." But the Union reads too much into our previous decisions. In Local 294 we simply held that a union does not commit an unfair labor practice by inducing an employer to make a *non-discriminatory* decision against an employee. Its teaching, therefore, does not apply to a case in which, as here, discrimination is established. Miranda Fuel is not in point for somewhat different reasons. It is true that Judge Medina's scholarly opinion suggests that an unfair labor practice is committed only if discrimination is "deliberately designed" to encourage union membership. But, in order to give that language its proper weight, it must be placed in context. When we do so, we note that the real issue in Miranda was whether a union committed an unfair labor practice by arbitrary action which "could not conceivably have been thought to encourage union membership, because [the employee's] demotion affected union and non-union men alike," 326 F.2d at 176; the union's motivation, as we read the case, was not really in issue. Finally, as we have already indicated, these cases must be read in the light of the Supreme Court's holding in Radio Officers', supra, that specific proof of intent is unnecessary where, as here, conduct inherently encourages union membership.

■ As a final measure, the Union argues that it did not "cause or attempt to cause" forbidden conduct because Ward could have resisted its demand that Fisher lose his seniority by seeking arbitration. Such a contention borders on the frivolous. First, substantial evidence supports the trial examiner's finding that Ward acted *solely* because of the suggestions and advice of the Union's representatives at the November 8 conference and in subsequent conversations with Personnel Manager McGuire. This finding establishes the requisite causation under Section 8(b)(2). Cf. N. L. R. B. v. International Union of Operating Engineers, 216 F.2d 161 (8th Cir. 1954). Secondly, it seems to us that Section 8(b)(2) would have no force if

a union's conduct were excusable simply because the employer *might* have resisted the union's desires by resorting to arbitration. Speculation as to the will or ability of a given employer to withstand union pressure can have no place in an area of the law already overburdened with hypothetical conjectures remote from the realities of industrial existence.

The Board's order is enforced.

FRIENDLY, Circuit Judge (dissenting):

The trial examiner's report, which the Board adopted, holds that a labor organization having a valid union security contract violates the first clause of § 8(b)(2), forbidding it to cause an employer by discrimination to encourage union membership, if it causes the employer to withdraw seniority from an employee who has taken advantage of a bylaw permitting him to avoid the payment of dues if he is willing to sacrifice his position as an active union member and as an employee. No administrative expertise or appropriate judicial deference to it can square such a result with a reasonable construction of the statute.

The supposedly offending provisions are those in Article XIV of the Local's and Article XIX of the International's By-Laws, both relating to withdrawal cards. Having the right to insist that a member continue the payment of his dues under any and all conditions or forfeit his membership, the union settled for something less. A member might withdraw "from his local's rolls of active members" and thereby have his obligation to pay dues suspended while ceasing to participate in any union affairs. However, he could join any sister local or resume active membership in his own without paying an initiation fee. Assumption of this status naturally carried a penalty—the member would be deemed to have withdrawn from holding or seeking employment within the local's jurisdiction.

It is undeniable that this condition "encourages" a member not to avail himself of the option but rather to continue

as a dues-paying member of the local under whose jurisdiction he has been working. But § 8(a) (3) clearly contemplates that this "encouragement," although no other, is permissible where there is a valid union security contract.[1] Congress' determination "to insulate employees' jobs" from union efforts to reward "good" members or to punish "bad, or indifferent" ones, Radio Officers' Union v. NLRB, 347 U.S. 17, 40, 74 S.Ct. 323, 98 L.Ed. 455 (1954), was paralleled by its recognition of "the validity of unions' concern about 'free riders,' i. e., employees who receive the benefits of union representation but are unwilling to contribute their share of financial support to such union, and gave unions the power to contract to meet that problem while withholding from unions the power to cause the discharge of employees for any other reason," 347 U.S. at 41, 74 S.Ct. at 336. Here the first proviso of § 8(a) (3) was met and the second was inapplicable.

When the first proviso allows an employer and a labor organization to require "membership therein" as a condition of employment, it surely permits a requirement of dues-paying membership, and the collective bargaining agreement between Ward and the union demanded exactly that.[2] Fisher, by acquiring a withdrawal card, voluntarily ceased to be a dues-paying, participating member of the union; the union bylaws already mentioned unequivocally provided this route for severing these basic ties with the union,[3] and Fisher took it as surely as if he had submitted a letter of resignation. By so doing, he laid himself open to job and consequent seniority loss under the security clause. I cannot believe anything should turn on the inept language specifying withdrawal from the "rolls of *active* members" when the remainder of the section made it clear that membership itself was being abandoned, saving only the initiation fee protected by another section.

The second proviso says, "That no employer shall justify any discrimination against an employee for nonmembership in a labor organization * * * (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership." The language, supported by the legislative history (H.R. 3020, 80th Cong., 1st Sess. § 8(d) (4) (1947) (passed by the House); S.Rep. No. 105, 80th Cong., 1st Sess. 20 (1947)), makes it clear that "terminated" refers to actions initiated by the union, such as expulsion, not by the employee.[4]

I would deny enforcement.

1. Boston's case, dealt with in Radio Officers' Union v. NLRB, 347 U.S. 17, 42, 74 S.Ct. 323, 98 L.Ed. 455 (1954), is distinguished by the absence of a valid union security contract, as well as by the fact that the union did not terminate Boston's status as a member.

2. "All present employees shall, as a condition of continued employment, maintain their membership in the Union [Local No. 50] during the life of this agreement through regular payment of dues to the Union."

3. "A withdrawal card shall signify that the member has voluntarily withdrawn from his local's rolls of active members and has withdrawn from holding or seeking employment within the work or geographic jurisdiction of this International or his local union. The holder of a withdrawal card shall be exempt from the payment of union dues and shall not be permitted to participate in local union meetings."

4. This answers the point made in the footnote to the majority opinion which relies on a partial quotation of similar language in the second clause of § 8(b) (2).