328 F.2d 28
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
BECHTEL CORPORATION, International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, Lodge No. 83, AFL-CIO, Respondents.
 No. 7034.
 United States Court of Appeals Tenth Circuit.
 February 25, 1964.
 Rehearing Denied April 30, 1964.
 
 Solomon I. Hirsh, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Stuart Broad, Washington, D. C., with him on brief), for petitioner.
 Gordon Johnson, of Thelen, Marrin, Johnson & Bridges, San Francisco, Cal. (Paul R. Haerle, and Peter V. Brucher, San Francisco, Cal., with him on brief), for respondent Bechtel Corp.
 Harry H. Craig, St. Louis, Mo. (Gibson Langsdale, Kansas City, Mo., with him on brief), for respondent Union.
 Before MURRAH, Chief Judge, and PHILLIPS and PICKETT, Circuit Judges.
 MURRAH, Chief Judge.
 
 
 1
 The N.L.R.B. petitions for enforcement of its conventional cease and desist, post notice, and make whole with back pay order, based upon its conclusionary findings that respondent Bechtel, an employer, violated Section 8(a) (3) and (1) of the N.L.R.A., and that the respondent Union violated Section 8(b) (1) (A) and (2) of the Act. The gist of the findings is that Bechtel encouraged membership in the Union by discriminatorily refusing to employ certain named complainants, because they were expelled members of the Union; and, that the Union either caused Bechtel to commit the unfair labor practices, or assisted it in the commission of such practices.
 
 
 2
 The relevant background facts are that the respondent Union Lodge 83 is composed of boilermakers, iron ship builders, blacksmiths, forgers and helpers, with a membership of about 1,100 members within its territorial jurisdiction over a three and one-half states area. It has traditionally operated a Hiring Hall for boilermakers at its Kansas City head-quarters and other designated places, from which it refers men to various jobs in the boilermaking trade. It is virtually the sole source for the employment of boilermakers in its jurisdictional area. As a result of an election in 1957, the Union became involved in a bitter struggle for leadership, and about 19 of the members were expelled from the Union, including the complainants involved in these proceedings. Sometime in 1958, respondent Bechtel undertook the construction of a generating plant at Lawrence, Kansas, for the Kansas Light & Power Company, with a completion deadline of April 1, 1960. At that time, Bechtel was a member of the National Constructors' Association, and was thereby a party to a national collective bargaining agreement with the Union, which pertinently provided that the employers should hire any qualified applicant for employment on a non-discriminatory basis, and when an employer has requested the Union to furnish men for a job, such men shall be selected by the Union on a non-discriminatory basis.
 
 
 3
 I. THE ALLEGED DISCRIMINATORY HIRINGS DURING THE PERIOD, FEBRUARY 24 THROUGH MARCH 27, 1959.
 
 
 4
 Bechtel did not bring any boilermakers or welders to the job, and for the initial hiring period between February 24th through March 27th, it followed customary practice of hiring all of its boilermakers and welders through the Union's Hiring Hall. Under the Hiring Hall arrangement, boilermakers, whether members of the Union or not, signed the out-of-work list, and were referred to jobs on order of the employers, either by name or on the basis of out-of-work seniority, i. e., first out of work, first referred to a job.[1] Under long-established practice, an employer admittedly could request any tradesman by name, because of his special skill in the work to be done. According to the findings of the Trial Examiner, "the out-of-work list which was in effect during the period when the events material here occurred, contained the names of all the complainants whenever they were unemployed, with the exception of Joseph Mueller,[2] * * *."
 
 
 5
 The complaint charged a general plan or scheme on the part of the Union, to discriminate against the expelled complainants by manipulating the out-of-work list to deny them equal opportunities for employment at "premium or desirable projects," as they became available throughout the Union's territorial jurisdiction; that the alleged discriminatory employment at the Bechtel project was a part and parcel of the general scheme; and, that Bechtel participated in the scheme by subserviently refusing to hire the complainants here, because they were expelled members of the respondent Union. The Trial Examiner recommended and the Board found, however, that the proof was insufficient to support the general or jurisdiction-wide charge; and, that there was no evidence that any expelled Union member, or anyone else, was ever denied the use of the Union's Hiring Hall facilities to obtain employment, and no evidence indicating a pattern of exclusion of expelled Union members from premium projects within its jurisdiction.[3]
 
 
 6
 The issues are defined and the controversy brought into focus by the Examiner's findings to the effect that soon after the complainants were expelled from the Union, and after they had signed the Union's out-of-work list, a group of them, headed by Leonard Adams, the unsuccessful rival of Akers in the Union conflict, determined among themselves to seek and obtain employment at the Bechtel project without referral from the Union, by filing application directly with the employer at the job site; and, that they would, at the same time, reject any referrals from the Union to other premium projects within the Union's jurisdiction, and would hold out until their positions on the list were reached for referral to the Bechtel project. In other words, these complainants were determined to secure employment at Bechtel, either by direct application or through seniority on the out-of-work list. The unfair labor practices are apparently sustained on the theory that the Union was equally determined to prevent any of the complaining expellees from securing employment on the Bechtel project; that it referred the complaining expellees to other premium projects within its jurisdiction, during the period in question, "in order to avoid referring them to respondent Bechtel's Lawrence project[4];" and, that Bechtel co-operated and participated with the Union, by refusing to employ any of the expellees, unless they were referred by the Union.
 
 
 7
 The Board adopted and apparently proceeded upon the Trial Examiner's legal premise to the effect that if an employer, under a Hiring Hall arrangement with the Union, retains the privilege of hiring employees directly, he may not condition employment on an applicant's clearance or referral by the Union, without violating Section 8(a) (3) and (1) of the Act. We cannot accept this legal premise as a basis for determining the validity of the charges in this case. Section 8(a) (3) and (1) condemns only a hiring hall arrangement or system, "which in fact is used to encourage and discourage union membership by discrimination in regard to hire or tenure, term or condition of employment." Local 357, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. National Labor Relations Board, 365 U.S. 667, 676, 81 S.Ct. 835, 840, 6 L.Ed.2d 11.
 
 
 8
 It is not an unfair labor practice for an employer to elect to avail himself of a non-discriminatory Hiring Hall, wherein as here, everyone is permitted to sign the out-of-work list, regardless of Union affiliation or standing, and specifically agrees to abide by the out-of-work seniority rules, as a condition to the use of the Hiring Hall for employment in the Union's jurisdictional area. Indeed, there is no objection to this hiring arrangement as such, and it is conceded that the employer could have lawfully agreed to use the Hiring Hall as an exclusive source of employment. The Board seemed to think that the vice lies in the employer's failure to contractually agree to the exclusive use of the Hiring Hall and by the acceptance of applications for employment at the job site. In that respect, it found that Bechtel declined to hire any of the expellees at the job site because the employer was co-operating with the Union to exclude them from the project; and, that inasmuch as Bechtel accepted applications for employment at the job site and declined to hire any of the expellee-applicants, it did so as a part of a conspiracy to exclude these complainants from the project. But, the evidence shows without dispute that, at the inception of the hiring period presently under consideration, Bechtel announced its intention to use the Hiring Hall referral system as its only source of employment.[5] And, it is agreed that the out-of-work list was the only reliable source of labor supply or means of employment.
 
 
 9
 While applications for employment were accepted at the job site, there were no hirings there — no one was led to believe that they would be hired there — and, as a matter of fact, it is a salient element of this unfair labor practice charge that all applicants at the job site were informed of the necessity of securing referral from the Union, as a condition of employment. All of the complaining expellees, having signed the out-of-work list and seniority agreement, were bound by their bargain. They could not object to the employer's recognition of their agreement, in which all the boilermakers were signatory parties. Certainly, they had no vested right to employment at Bechtel, in preference to other members of the trade who relied upon the out-of-work list as their only means of securing employment in the Union's jurisdictional area. Moreover, it seems doubtful whether, in these circumstances, Bechtel could have hired the applicants at the job site, without discriminating against those who did not apply directly, but relied upon their seniority on the out-of-work list for job opportunities.
 
 
 10
 We think Bechtel elected to hire exclusively through a non-exclusive hiring hall arrangement, and in doing so, committed no unfair labor practice. Since we hold, contrary to the Board's decision, that it was not an unfair labor practice for Bechtel to deny employment to these complainants, without referral from the Union's out-of-work list, the Board's otherwise conclusive finding to the effect that the respondents conspired to deny employment on application made at the job site, is irrelevant to the unfair labor practice charged. The narrow and decisive issue then is whether the Board's order can be sustained on its findings to the effect that the respondents, employer and Union, conspired to manipulate the out-of-work list to bar the expellee-complainants from the Bechtel project, thereby encouraging Union membership. It being agreed that the out-of-work list was non-discriminatory — i. e., everyone seeking employment within the Union's jurisdiction was permitted to sign it — each of the complainants has the burden of proving, not only the existence of the conspiracy between the employer and Union to exclude the expellees, but that he was denied employment at Bechtel when he was entitled to such employment by virtue of his seniority on the out-of-work list, or that by reason of his special skill, he would have been requested by name, in the absence of an agreement between Bechtel and the Union to exclude him from the project. In that respect, it is important to keep in mind that the hiring hall arrangement was not designed to serve the Bechtel project alone, but was intended to serve as an employment agency for the boilermaker trade throughout the Union's jurisdictional area, and was so operated. The Bechtel project was only one of the job opportunities within the three and one-half states area, and no one had a preferential right to be employed at Bechtel. The out-of-work list agreement, which the complainants had signed, specifically provided that if anyone signing the agreement refused to accept offered job opportunities for which they were qualified, their name would be placed at the bottom of the out-of-work list, i. e., see Footnote 1. This arrangement and this binding agreement must govern the rights of the parties to employment at Bechtel. It necessarily blueprints the unfair labor practice charged. And, it is within this frame of reference that we must determine whether the Union and employer conspired to manipulate the out-of-work list, or to refrain from requesting any of the complainants by name, in order to bar them, or any of them, from the Bechtel project.
 
 
 11
 There were three separate hirings by Bechtel while it was utilizing the Union's Hiring Hall, between February 24th and March 27th. The first occurred on February 23rd when, upon recommendation of Akers (the newly elected Business Manager of the Union, who was in charge of the out-of-work list), Bechtel hired General Foreman Williams, a long-time member of the Union in good standing, and admittedly well qualified for the position. Williams had no authority to employ anyone for the project, but made recommendations to Draeger, Bechtel's Project Superintendent, who was authorized to hire for the project, and who relied heavily upon Williams' recommendations. Soon after his employment as General Foreman, Williams was directed by Draeger to go to the respondent Union's Hiring Hall and request the referral of three boilermaker mechanics to do some temporary unloading work, and to arrange for the employment of an Assistant Foreman. Williams went to the Hiring Hall shortly before February 23rd, and consulted with Osbourn, vice Akers, concerning the temporary employees and an Assistant Foreman. Three men were referred from the Union's out-of-work list, as temporary employees for the unloading work, and Ray Sharp was finally accepted as Assistant Foreman to report later, after Williams was informed that Davis and Quinn, requested by name, were unavailable. There is no contention that this hiring was in any sense discriminatory.
 
 
 12
 About this time, and on February 24th, six of the expellee-complainants (Adams, Mecum, Hernandez, Markus, O'Connor, and Owen), headed by Leonard Adams, all of whom had signed the Union's out-of-work list and who the Examiner found had determined to secure employment at the Bechtel project, went directly to the job site and signed applications for employment. When, later in the afternoon, Draeger learned that they had made application for work at the job site, he thought it strange because, "* * * in all of his experience as a construction job Superintendent, he had never had a group of employees file application at the job site." Having general knowledge of the Union conflict and suspecting that the applications were in some way connected with it, Draeger called the Union office and was told by Akers that the applicants were among the group of expellees, but that their names were on the Union's out-of-work list and they would be referred for work, when their turn for referral was reached. According to the adopted findings, Draeger thereupon informed Akers of his intention to make another request "for referral of additional and other types of boilermakers, in a day or so," and after this conversation, Akers sent a referral notice to Adams on the same day, to report for work at another premium project in Kansas City, Kansas, which Adams understood would last five to six months. Adams declined the referral, after discussing the matter with Akers, stating that he would take his chances on employment at Bechtel.
 
 
 13
 There were no further hirings until March 18th, when Draeger called the Union office to request the referral of two certified heliarc welders and a Gang Foreman, to report for work the next day. Upon advice from General Foreman Williams, Howard was requested by name for Gang Foreman. Howard had worked under Williams in a number of projects, the most recent of which was in the previous December. In addition to Howard, Ermal Stewart and Clarence Helm were referred from the out-of-work list as the two other welders to take the test as certified welders.
 
 
 14
 On the day before the request for these referrals, Adams and other expellees returned to the project and filed new applications for employment. After filing the applications, they went on the project to talk to Foreman Williams about their chances of obtaining work at the project. When asked how soon the hiring would begin and about their chances of getting a job, Williams told them he didn't believe they were going to get a job because it was going to be a Union job, and told them that the only way they could get a job was to join the "Pipefitters' Union" Williams explained that the statement was jokingly made, because it was general banter in the trade that the Pipefitters were taking over the boilermaking trade. The Examiner, however, refused to take the statement lightly, and construed it as intending to convey the idea that the Union was controlling hiring at the project, and that they could not hope to obtain work there, because of their expulsion from the Union. On the following day, another complainant, Owen, went to the project to file a new application and while there, met and told Williams that he was anxious to get a job. Williams told him that he would gladly give him a job, but that he would have to get the Union's clearance.
 
 
 15
 When on March 18th, Draeger discussed the March 20th hirings with Akers, he told him that they were going to get their job started and wanted to know about the work situation. Draeger was told that there were a lot of men available. Draeger made some remark about Akers' "trouble," and was told that it was "alright." Draeger said, "Well, there have been some of them running up here, making applications." Akers replied that it didn't make any difference, "If we have them on the list, you will get them any way, when their turn comes."
 
 
 16
 Two days later, Draeger did call the Union office and requested four additional welders, preferably with heliarc welding experience, to take the test to work as certified welders. He also requested the referral of a boilermaker to work as a welder's helper, and a "lay-out-man." He was told that Delphin Young, who had experience in both welding and lay-out work, was available, and Young was referred to the project as the "lay-out-man." Akers then suggested to Draeger that the time had come for a Job Steward to be selected, and Greenup, the Union's Vice President, was selected as the Steward for the project. The five other employees, Deml, Moore, Ehlers, Burke and Wallace, were selected to report for work on March 24th — Moore did not report until March 26th.
 
 
 17
 The Examiner found that Deml was not a welder, but a rigger, and that Akers had deliberately selected him as a welder, knowing that he was not qualified, because there were no other available welders ahead of complainant Mecum on the out-of-work list. Akers attempted to refer Mecum to another premium project on the same day, and the Examiner construed this referral as indicative of Akers' determination not to refer any of the expelled members who had made application for work directly at the project. On March 23rd, the day before Deml, Moore, Ehlers, Burke and Wallace were to report for work, complainant Mecum and three other expelled Union members, Quinn, Miller and McGlinn, went to the project to apply for work. Before filing application, they asked Williams about their chances to get work at the project and told him they intended to file applications. Williams told them that it would do no good, because Bechtel was hiring only employees referred by the respondent Union. He advised them not to file applications, because it would prejudice their chances of being referred to the project from the out-of-work list. According to the findings of the Examiner, Williams indicated to them that he would hire all of them, if they could get clearance from the Union. Specifically, Williams was said to have told Quinn that he had tried to persuade the Union to let him hire Quinn, as Assistant Foreman, but the Union had objected. He is also said to have told Mecum that he needed him badly, because the three welders who had been referred on March 18th were having trouble passing their tests, and one of them had failed to pass the heliarc welding test. Williams urged Mecum to get the consent of the Union, so that he could work as a welder-tester and instructor, and later as a pusher.
 
 
 18
 As a result of this conversation with Williams, all four employees, including Mecum, decided not to file applications for work, but to return to the Union's Hiring Hall to see if they could get referrals to work at the project. When they returned to the Union office, Akers was absent. All except Miller returned on the following morning, March 24th, and Mecum and Quinn saw Akers the next afternoon. When they requested referral to the project, they were told that they would be referred, if the Project Superintendent requested them by name. Mecum told Akers that Williams had expressed a need for him as an instructor and as a pusher. He was then told that he would be referred, if he would first do a small welding repair job somewhere else. The next morning, Mecum appeared at the Union office as agreed, with his welding equipment, to perform the repair job. After waiting almost all day, Akers appeared. When Mecum complained about the delay and demanded that he be referred to the Bechtel project, Akers rejected the demand, telling him that he would not refer him, unless the Superintendent requested him by name. Mecum insisted that Williams had requested him. Akers retorted, "Williams is not putting this monkey on my back," and said he would call Williams, to find out if Mecum was being requested by name. When Williams was finally contacted, Akers told Williams, in Mecum's presence, that he should stop telling "Mecum and others who were seeking work at the project, that he needed and wanted them," and asked if he was formally requesting the referral of Mecum. Williams answered that he was not. When Akers finished his conversation with Williams, he turned to Mecum and told him that he was not being requested by name. Mecum then insisted on speaking to Williams, personally, and asked him why he was not being requested, after he had been told that he was needed badly at the project. Williams insisted that he was not being requested by name, and Mecum accused Williams of giving him "the run around," and angrily left the Union office. The Trial Examiner found that Williams repudiated Mecum at the time, in accordance with Draeger's policy not to hire any "of the expelled members unless and until Akers indicated that he could do so."
 
 
 19
 With the possible exception of Adams, Mecum and Quinn, there is no evidence on this record from which it can be said that any of these expellee-complainants was denied employment at Bechtel when their position or rank on the out-of-work list entitled them to referral and employment, over those who were hired by Bechtel. While the Board found that Williams told other applying complainants that he would be glad to have any of them, except Findley and Markus, if they would secure clearance through the Hiring Hall, this statement is entirely consistent with Bechtel's policy to hire exclusively through the Hiring Hall. There is nothing on the record to indicate that any of these complainants were requested by name, or that they would have been requested by name, in the absence of an agreement not to do so.
 
 
 20
 As to Adams, the record shows by his own testimony that, in the first place, he was not a welder but a rigger; and, that he declined at least five job opportunities during the time he was waiting to be referred to Bechtel, more than one of which was equally desirable. One job opportunity in Kansas City, Kansas was within thirty to forty minutes driving distance from his home. He declined to take this job for the stated reason that the Bechtel project was personally preferable, and that, inasmuch as others were being hired on the project, who had finished jobs since his last job, he was entitled to be referred. Adams was laid off on December 14th, and refused to sign the out-of-work list until February 2nd, and he was never able to prove that he was entitled to work at Bechtel by reason of his seniority on the out-of-work list, nor did he attempt to prove that by reason of his special skill, he should or would have been requested by name, in the absence of a conspiracy to exclude him from the project.
 
 
 21
 With respect to Quinn, the undisputed facts are to the effect that when Wiliams went to the Hiring Hall at Draeger's direction, soon after his employment as General Foreman, to hire temporary employees and to select an Assistant Foreman, he asked for either Davis or Quinn by name, and was told that both were employed and unavailable, but that Sharp was available. At that time, Quinn was employed on a project in Omaha, Nebraska, and did not leave that job until March 20th. He returned to Kansas City, signed the out-of-work list on March 23rd, and went immediately with Mecum, Miller and McGlinn to the Bechtel project, to inquire about employment directly at the job site. As we have seen, the last request for referrals was made on March 20th, to report for work on March 24th, and Greenup, Young, Deml, Moore, Ehlers, Burke and Wallace had already been referred to the project. At the same time, Sharp was ordered to report as Assistant Foreman on April 2nd. It is in this context of undisputed facts that we must consider the Examiner's findings to the effect that Williams had been prevented from hiring Quinn as Assistant Foreman, because of the Union's objection to his employment. The conclusive answer is that Quinn was not available for work when Sharp was selected or ordered to report as Assistant Foreman. Moreover, there is no contention that Sharp's selection was discriminatory. He did report for work on April 2nd, as agreed. And, since Quinn was not available for work at Bechtel until March 23rd, after the last of the alleged discriminatory hirings on March 20th, he cannot make out a case of discrimination even though, as the Examiner found, the Union objected to his employment at Bechtel.[6]
 
 
 22
 The situation is quite different with respect to Mecum. Mecum was a qualified heliarc welder. According to the adopted findings, Akers referred Deml, who was not a welder, but a rigger, to the Bechtel project, because "apparently there were no other welders other than Mecum on the out-of-work list who were available for work at the Lawrence project at that time;" and, that Akers' attempt to refer Mecum to another project on the same day, indicated Akers' "determination not to refer any of the expelled members who had made application directly at the Lawrence project to that project." We are unable to positively say on this record, that the Union did not manipulate the out-of-work list and otherwise maneuver Mecum's job opportunities, to exclude him from the Bechtel project when he was entitled to referral by reason of his seniority.
 
 
 23
 There is slim factual basis for saying that Bechtel knew, or had reason to know, that Deml was referred by Akers when Mecum was entitled to be referred, by virtue of his seniority on the out-of-work list. But, the Board has found in effect that Williams refrained from requesting Mecum by name, in accordance with Company policy not to request any of the expellees by name, regardless of their special skills. While Williams had no authority to hire, his recommendations did undoubtedly carry great weight and, in the circumstances, we are unable to say that the Company is not bound by his actions with respect to Mecum. Giving full credit to the factual findings of the Board, its order against the Union and Bechtel with respect to Mecum will be enforced, but since the case of each complainant must rest upon its own factual footing, we must respectfully decline to enforce the Board's order, as to the other complainants, for this hiring period.
 
 
 24
 II. THE ALLEGED DISCRIMINATORY HIRINGS AFTER MAY 11, 1959.
 
 
 25
 The hirings by Bechtel subsequent to March 27th, which the Board held to be discriminatory with respect to these complaining expellees, were based upon an entirely different hiring policy. The undisputed background facts, as summarized by the Trial Examiner, are as follows: On March 24th, when all of the last referrals from the Union's Hiring Hall were to report for work, the Union referred two of the expelled Union members (Findley and Markus) to a project at Montrose, Missouri. When they reported for work on the morning of the following day, the Union members previously referred to the project refused to work with them, and the employer declined to hire them because of the objection of the employed Union members. The expellees returned to the Union office, and asked to be sent to some other project. Akers insisted that they return to Montrose and gave them new referral slips, to report on March 26th along with expellee O'Connor, who was also referred. When these three expellees reported to the Montrose project on March 26th and were employed, the Union members walked off the project, and the employer was compelled to discharge the expellees, in order to avoid a work stoppage. Upon learning of this incident, Draeger notified Bechtel's Labor Relations Director, at the home office in San Francisco, and was directed not to hire any more welders or boilermakers and the work was carried on without further employment, pending investigation.
 
 
 26
 Upon investigation, the Company was fully apprised of the bitter factional fight within the Union; that the Union was divided between 700 to 800 members in the majority or Akers' faction, and 150 to 175 in the minority group. Facing a deadline, with heavy penalties, the Company decided to abandon the Hiring Hall altogether, and to select its employees exclusively from the majority group.[7] Draeger was accordingly instructed to prepare a master list of all boilermakers in the area, who were known to be members of the majority group — the Akers' faction of the Union. Draeger, in turn, instructed Williams to prepare the list from his knowledge of the identity of the Akers' men, and to consult with other Union members on the job, whenever he was in doubt about a prospective employee's loyalty to the Akers' faction. Williams prepared a preliminary list of about fifty boilermakers, whom he knew to be supporters of the Akers' faction, and from time to time obtained additional names from workmen on the project, which he sent to Draeger on separate lists, as supplements to the original list. Any qualified boilermaker whose application was on file, was considered for employment, even if his application was more than ten days old.
 
 
 27
 During the latter part of March and early part of April, complaining-expellees, Adams, Owen, O'Connor and Mueller, filed applications for work directly at the job site. All applications filed by expelled members were placed in a separate file in the field office, to indicate that they did not belong to the majority faction. Complainants, Quinn, Miller and McGlinn never filed application at the job site.
 
 
 28
 After preparation of the original list, Draeger and his assistant, Winandy, began to contact the prospective employees by telephone, telegraph and through other members of the majority faction, inviting them to file applications directly at the project. On May 11th, Draeger was instructed to commence hiring at the job site. Although the Union was contacted for information concerning prospective employees, it would have nothing to do with this hiring arrangement. None of the employees were taken from the Union's out-of-work list. It protested Bechtel's method, insisting that the employees be taken from the customary out-of-work list, but conceded Bechtel's right to hire directly at the project, under its contract with the Union. During the progress of the work, Bechtel hired eighty-eight or eighty-nine boilermakers from the majority or Akers' faction of the Union. None of the expellee-applicants were hired at the project.
 
 
 29
 The Board conclusively found that the complaining expellees were denied employment at Bechtel, because of their affiliation with the minority faction of the Union. Bechtel justifies this admitted hiring practice on the theory that it was unconcerned with Union affiliation or standing, and had no disposition to favor either faction, but was concerned solely with numbers as a source of labor supply. The contention is that it simply found itself in the midst of the strifetorn Union, and pursued the only course available, to secure a harmonious and efficient labor force. But, the Board, adopting the Examiner's perceptive interpretation of the facts, found that even though Bechtel had no intent to assist the majority faction and thereby encourage Union membership, the admitted discrimination had the inevitable and foreseeable effect of doing so; and, that Bechtel is presumed in law to have intended the foreseeable consequences of its discriminatory conduct.
 
 
 30
 It is, of course, readily apparent that the intra-union strife put Bechtel on the horns of a dilemma. If it hired from the minority faction of the Union, of which the complaining expellees were members, it would undoubtedly have been faced with dissension and probable work stoppage. At the same time, it declined to hire them, at the risk of interfering with the right of employees to "freely exercise their right to join unions, be good, bad, or indifferent members, or abstain from joining any union without imperiling their livelihood." Radio Officers' Union of Commercial Telegraphers Union, A. F. L. v. N. L. R. B., 347 U.S. 17, 40, 74 S.Ct. 323, 335-336, 98 L.Ed. 455. No one can say that Bechtel was disposed to encourage membership in the Union, or lend support to the leadership of either faction. But, even though its decision to employ exclusively from the Akers' faction was prompted by legitimate motives of self-interest, this hiring policy undoubtedly had the foreseeable consequence of punishing the expelled members of the Union, thus encouraging loyalty to the Union and its leadership.
 
 
 31
 The decisive question is whether the prejudicial effect of the employer's inherently discriminatory hiring policy can be "saved from illegality by an overriding business purpose." National Labor Relations Board v. Erie Resistor Corp., 373 U.S. 221, 231, 83 S.Ct. 1139, 1147, 10 L.Ed.2d 308. Here again we must recognize the Board's special function of balancing conflicting legitimate interests, in order to effectuate national labor policy. In balancing those interests, the Board in our case has apparently decided that the claimed legitimate business purpose did not out-weigh the harmful consequences to the complainants' labor rights. That finding is binding here. See: National Labor Relations Board v. Erie Resistor Corp., ibid.
 
 
 32
 It follows that the Board's cease and desist, post-notice, and make whole with back pay order must be enforced against Bechtel, as to those complaining expellees, Adams, Owen, O'Connor, Mecum, Markus, Hernandez and Mueller, whose applications were on file when Bechtel commenced hiring at the job site on May 11, 1959.
 
 
 33
 The record shows that complainants, Quinn, Miller and McGlinn, never filed applications at the job site, but as we have seen, they were deterred from doing so by the representation of Williams, that it would prejudice their opportunity for work through the then existent referral system. At the time this representation was made by Williams, it was consistent with Bechtel's hiring policy. But, when Bechtel commenced hiring at the job site on May 11th, these expellees were well known to Williams, and it is fair to say that they were deliberately omitted from the list of prospective employees, and were the victims of the discriminatory hiring practices, quite as much as those who had formally made applications for work at the job site. And, the Board's order against Bechtel will be enforced as to them, for the hiring period after May 11, 1959.
 
 
 34
 Finally, we consider whether the Board's order finding that the respondent Union assisted Bechtel in the perpetuation of its hiring policy, following May 11th, with consequent discrimination against the complainants, can be sustained by the evidence. We have had occasion to say that neither an employer nor the union "can be held accountable for the unilateral actions of the other. Neither is bound to police the other nor can it be inferred that an unfair labor practice indulged in by one is caused by the undisclosed activity of the other, or through the tacit understanding of both." N. L. R. B. v. Brotherhood of Painters, etc., 10 Cir., 242 F.2d 477, 480. Although the Board found that the Union had nothing whatsoever to do with Bechtel's decision to hire all of its employees at the job site, following May 11th, it was of the view that the Union thereafter gave active assistance and support to Bechtel's hiring policy, primarily through Greenup, Vice President of the Union and Job Steward on the project. See: N. L. R. B. v. Local 369 Intern. Hod Carriers' Bldg. and Common Laborers' Union of America, A. F. L., 3 Cir., 240 F.2d 539.
 
 
 35
 The record does show that Greenup did actively participate in the compilation of the list of prospective employees from members of the majority faction; and, that although he made recommendation as to qualification, he was also consulted as to loyalty to the Akers' faction. The Board further found that Akers was fully aware of the activities of Greenup in the furtherance of Bechtel's hiring policy following May 11th; and, that Greenup conferred with Akers, concerning Bechtel's hiring policy and was told "to continue exercising some control over the hiring of employees at the project until [Akers] and the International were able to persuade the Respondent Bechtel to resume hirings through the Respondent Union's hiring hall." The Board also thought it significant that it was not until after these charges were filed, that the Union notified Bechtel that it had no objection to the expellees being hired at the Lawrence project.
 
 
 36
 On the whole record, we are unable to say that the Union did not actively aid and abet Bechtel in the furtherance of its discriminatory hiring practices, following May 11, 1959. The Board's order will thus be enforced against the Union, except as hereinbefore noted with respect to hirings during the period February 24 through March 27, 1959.
 
 
 
 Notes:
 
 
 [1]
 Each tradesman who voluntarily signed the out-of-work list was also required to sign the Out-Of-Work Or Seniority List agreement (apparently in force throughout the international Union membership), which recited the need for the maintenance of the Hiring Hall, as a source and means of employment, and specifically provided that, "[i]n order to avail myself of the services of Local Union 83 in the securement of work opportunities, I voluntarily request that my name be placed on the `out of work' or `seniority list.' Recognizing the obligations of Local Union 83 under the terms of agreements with employers if and when called upon to furnish qualified men on a non-discriminatory basis, I agree that if for other than compelling personal reasons: (1) I refuse to accept offered work opportunities for which I am qualified, my name will be placed at the bottom of the `out of work' list; or * * * (4) If and when I secure employment within the jurisdiction of Local Union 83, except on jobs of less than ten (10) working days duration, my name will be removed from the `out of work' list and not returned thereto until I notify the Local Union of the termination of said employment and request that my name be placed on the bottom of the `out of work' list."
 The agreement further provided that the only exception to this practice of seniority for work opportunities is "when a call is received for a man or men with special skills, not possessed by a senior man or men, in which event the senior qualified man on the list shall be entitled to the work."
 
 
 [2]
 Mueller never signed the out-of-work list agreement, and did not apply for employment directly with Bechtel until April 14, 1959. He is, therefore, not involved in the alleged discriminatory hirings for the period presently under consideration, i. e., February 24 through March 27, 1959
 
 
 [3]
 The Trial Examiner inquired, "There is no question of unlawful hiring hall agreement here, is there?" Counsel for the Board replied, "We don't think so, Sir. There is no proof of it, in our opinion. * * * There is no unlawful hiring hall as such, Sir. As I said already, I would like to emphasize it again — we consider the instant proceedings one involving cases of individual discrimination. No Mountain Pacific [Mountain Pacific Chapter of the Associated General Contractors, 119 N.L.R.B. 883 (1958)] is involved, or anything of that kind."
 
 
 [4]
 Upon recommendation of the Examiner, the Board dismissed Findley's complaint against the Union, on the ground that General Counsel had failed to prove that the Union had generally discriminated against the expelled members at its Hiring Hall, by failing and refusing to give them their fair share of referrals to "premium projects," and that Findley had never filed application for employment at the Bechtel project
 In a Footnote to his recommended findings, the Trial Examiner could not "refrain from observing that the General Counsel's effort to prove that the Respondent Union had a general plan or scheme to discriminate against the complainants at all of the `premium' projects located within its jurisdiction served only to confuse the evidence concerning the alleged specific discrimination practiced against them at the Lawrence project. It was obvious to me early in the hearing that the General Counsel's representative had no clear conception of the proof which was necessary to prove the allegations contained in paragraph 10 of the complaint [the general or jurisdiction-wide charge] against the Respondent Union. This lack of comprehension on his part and his failure to distinguish between the elements of proof necessary to establish the alleged specific discrimination practiced against the complainants by both Respondents at the Lawrence project as distinguished from the alleged general discrimination practiced against them by the Respondent Union in the making of referrals generally from its out-of-work list to projects located within its territorial jurisdiction made it extremely difficult for the Trial Examiner to conduct an orderly hearing and to write an Intermediate Report in this proceeding."
 
 
 [5]
 The adopted findings are that "although the contract which respondent Bechtel had with respondent Union gave it the privilege of hiring its employees at the Lawrence project, it elected to hire its boilermaker employees for that project through the respondent Union's Hiring Hall, located at Kansas City, Missouri." In a footnote, the Examiner observed that "there is no contention by General Counsel that this election was made in order to discriminate against the complainants."
 
 
 [6]
 In a Footnote, the Examiner found "* * * that Williams told [Quinn] he had tried to get Akers to consent to his being used as a supervisor at the project but that Akers had objected. Although Williams had previously agreed to use Ray Sharp as his assistant, I find that he called Akers about Quinn because he had received information that Sharp had been referred to another project and that Quinn would be available after March 20th." We fail to see how his finding can possibly affect the salient facts of the case
 
 
 [7]
 Eric Miller, Bechtel's Labor Relations Manager, testified that upon completion of its investigation of the intra-union conflict, he instructed Draeger "to secure names of members and qualified boilermakers that were part of this majority group and who could be certified * * * as being capable men who would work together harmoniously and give us a day's work. Our problem at this point was, and we'd been through this thing before, that we could not afford to get [fighting] factions on our job, we had a tight schedule, we made the decision that we had to secure these men from one or the other of these factions. Having been told of this split vote on election, it appeared to me that this minority faction which may have included shop men was an unknown quantity of skilled boilermakers to do our type work, so we came to the conclusion that we had to staff the job from this majority group in the local union, and we instructed Ed Draeger, as I said awhile ago, to secure lists of qualified men from this group, secure their home addresses, telephone numbers, get the recommendation from our supervision on the job, and to go ahead and contact them and start hiring them directly at the job, not to go through the union hiring hall
 "Q. [By Mr. Johnson] By the way, at that time, did you have any estimate as to what your peak employment of boilermakers on the job would be, numberwise?
 "A. We would have needed about eighty or ninety people."
 In answer to a question by the Trial Examiner, whether Bechtel's hiring exclusively from the majority faction was prompted by the thought that if the minority members were hired, the majority members would not work and cause a stoppage on the job, Miller answered, "Well, we didn't give that part of it so much thought as we did the opening up of our job for a debating society for factions which we felt would create a decrease in the daily production of perhaps both groups who were on the job, because their mental attitudes and their bickering back and forth would, in our opinion, place them in a position where they wouldn't be at their work eight full hours a day."