**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 776, IATSE (FILM EDITORS), Respondent.**

**LOCAL 776 (FILM EDITORS), Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 16907.**

United States Court of Appeals
Ninth Circuit.

May 10, 1962.

Stuart Rothman, General Counsel, Dominick L. Manoli, Asso. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin Pollack, A. Brummel, Attorneys, N. L. R. B., Washington, D. C., for petitioner.

Gilbert, Nissen & Irvin, Robert W. Gilbert, Beverly Hills, Cal., for respondent.

Before BARNES and KOELSCH, Circuit Judges, and YANKWICH, District Judge.

KOELSCH, Circuit Judge.

The National Labor Relations Board found that Local 776, International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada (hereinafter "Respondent"), violated section 8(b) (2) and 8(b) (1) (A) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 158(b) (1) (A), (2), by causing Cascade Pictures Co. of California, Inc. to discharge an employee, Henry A. Carlson, for lack of union membership.[1] The matter is now before the court on the Board's petition for enforcement of its ensuing order and Respondent's cross-petition to review that order.

Respondent objects to the granting of the relief sought by the Board and attacks the validity of the order on three grounds: (1) insufficiency of the evidence to support the critical finding; (2) error in the admission of evidence, prejudicial to the Union; and (3) the order is excessive in scope.

It should be noted with reference to the first of these three grounds that the questioned finding is predicated upon the commission of an unfair labor practice by Carlson's employer. If Cascade's act did not constitute a violation of section 8(a) (3) or if, although it was a violation, the dismissal of Carlson was not caused by respondent, then respondent was not guilty of an unfair labor practice under sections 8(b) (1) (A) and (2).[2]

The trial examiner acknowledged in his Intermediate Report that there was no direct proof of respondent's complicity in the dismissal; however, he was of the opinion that the record manifested an "implicit" demand by respondent upon Cascade to discharge Carlson. Respondent readily recognizes the power of the Board to draw reasonable inferences and make other pertinent deductions from the evidence (Radio Officers' Union of, etc., v. N.L.R.B., 347 U.S. 17, 48–52, 74 S.Ct. 323 (1954)), but argues with much vigor that here this founda-

---

1. In pertinent part these sections provide that:

Sec. 8 "(b). It shall be an unfair labor practice for a labor organization or its agents—(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7 of this title: * * *; (2) to cause * * * an employer to discriminate against an employee in violation of subsection (a) (3) of this section * * *."

The relevant portion of Section 8(a) (3) and of Section 7 referred to reads:

Sec. 8 "(a). It shall be unfair labor practice for an employer—* * * (3) by discrimination in regard to hire or tenure of employment on any terms or conditions of employment to encourage or discourage membership in any labor organization: * * *."

Sec. 7: "Right of employees as to organization, collective bargaining, etc.

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) ▮ of this title."

2. Carlson made no complaint against Cascade so the Board lacked authority to include the employer as a party. Radio Officers' Union of, etc., v. N.L.R.B., 347 U.S. 17, 53, 74 S.Ct. 323, 98 L.Ed. 455 (1954) (dictum); N.L.R.B. v. Local 57, Etc., 201 F.2d 771 (1st Cir. 1953).

tion is completely absent so that the finding is not "supported by substantial evidence on the record considered as a whole * * *" within the meaning of sections 10(e) and (f) of the Act.[3]

█ We have carefully considered the contention, keeping in mind that "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight" (Universal Camera Corp. v. N.L.R.B., 340 U.S. 474 at 488, 71 S.Ct. 456, at 464, 95 L.Ed. 456 (1951)), but nevertheless conclude that the Board's factual conclusion is neither unreasonable nor too tenuous to stand.

Cascade, Carlson's employer, was engaged in the branch of the motion picture industry that produces and distributes "television commercials"; it was party to a collective bargaining agreement covering employees who were engaged in "crafts and classifications of work over which * * * [a number of designated unions including the respondent] had jurisdiction." Carlson worked in the shipping department under the immediate supervision of one Selson; his particular job was "to break the film down, put it on reels, label it and see that the paper work, bills of ladings [sic] and anything concerning its movement was correct and that it was carried out." He had been so employed for several weeks before Cascade learned that he was not a member of any union. But although Cascade considered his job "unorthodox" as compared with the type of work performed by any of its union-affiliated employees, it nevertheless inquired of respondent whether the job was governed by the existing collective bargaining agreement. Todd, respondent's assistant business agent, thereupon visited Cascade's plant where he discussed the matter with Bernard Loftus, Cascade's supervising editor who was in charge of employment. A few days later he notified Loftus that the job came under respondent's jurisdiction. Carlson testified that thereupon "Mr. Loftus said he was very sorry, that he had the Union on his back and he was forced to let me go by the end of the week."[4] Carlson's replacement, who was referred to Cascade by the respondent, was one of its members.

We are inclined to agree with respondent that if the matter had progressed no further and the record revealed no more than the conference between Loftus and respondent's agent, together with Carlson's discharge and Loftus' statement, hearsay as to respondent, then N.L.R.B. v. Amalgamated, etc., 202 F.2d 671 (9th Cir. 1953), which respondent urges upon us as "directly in point", would dictate a denial of the Board's petition. But such is not the situation. Respondent twice more appeared in the picture. Thus shortly after Carlson was given notice, Todd, at Selson's request, again came to the plant, where Selson explained that he particularly wanted to keep Carlson and asked whether that might be arranged. Carlson testified that during the meeting Todd observed that Cascade had itself to blame for any inconvenience due to the dismissal because "they should never had hired me in the first place because at the time I was hired the Union had members out of work." Todd further stated that the matter was one that would have to be considered by his superiors, and left. During the week Carlson visited Todd at the latter's offices. On that occasion, according to the witness, Todd advised him that Cascade had violated its contracts with respondent and was subject to a fine "but that the cause of [because of?] the unusual

3. In Consolidated Edison Co. of N. Y. v. N.L.R.B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126, the Supreme Court defined the term "Substantial evidence" as " * * * more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." However, evidence is not substantial if it appears adequate only in isolation; it must possess that quality when viewed in proper perspective. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456 (1951).

4. Webster's New International Dictionary (2nd ed. 1960) defines the term "on one's back" as "assailing or weighing upon one."

conditions as he called it, but [sic] they would not do that. He said for those reasons it would be necessary or better to discontinue my employment at Cascade. After that, he brought up that while the Union had no legal obligation to do anything for me he felt it was sort of a moral obligation to do something to make up for the job I had lost. And he was going to see that I would get a summer job * * *."

■ As might be expected, there were numerous conflicts in the evidence, and Carlson's testimony was sometimes at variance with, and even at other times flatly contradicted by, the testimony of other witnesses, especially Todd. But the trial examiner resolved the conflicts in favor of the version given by Carlson, whom he fully credited, in preference to the facts asserted by the other witnesses; and the Board accepted and adopted his findings. There the matter must rest for it is not for us to judge the credibility of witnesses; that is the function of the trier of fact. Universal Camera Corp. v. N.L.R.B., supra.

■■ That respondent was guilty of an unfair labor practice under section 8 (a) (3) of the Act appears beyond peradventure; Loftus flatly testified that "the sole reason" for Carlson's dismissal was the latter's nonunion status and his earlier statement to Carlson assigning union pressure as the basis for this action was to the same effect even though he named no particular union. It is, of course, true that the Act extends no protection against discharge to the employee who is incompetent, insubordinate or otherwise disqualified from continuing to work; but here all the proof was to the contrary and the efforts Cascade made to reinstate Carlson more than suggest his services were satisfactory. It is likewise true that the section 8(a) (3) of the Act extends only a limited protection to nonunion members whose employers have entered into collective bargaining agreements containing union security clauses, for a proviso in that section of the Act permits the discharge of an employee who had not secured union membership within a specified time, usually thirty days after hiring, as an exception which may be asserted by way of defense to a charge of an unfair labor practice.[5] But here, respondent made no attempt to bring the discharge within that exception; it simply "plead the general issue" by putting the general counsel to his proof, or, to use respondent's statement appearing in its brief:

> "The defense offered by Local 776, as the Trial Examiner correctly observed, was that the Union did not request or otherwise do anything which made it responsible for causing Carlson's discharge and 'disassociates itself from this conduct of the Company.' "[6]

And the sequence of events, the fact that Carlson's job was taken by a member of respondent's union, the statements of Todd and his recognition of respondent's "moral obligation" to find Carlson

---

5. The proviso referred to reads:
   "That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization * * * to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later * * *."

6. In this court respondent obliquely makes the belated assertion that even if it caused Cascade to discharge Carlson because of his lack of union membership, it was privileged to do so under the union security provision contained in the collective bargaining agreement. However, as noted in the body of the opinion, this defense was not formally tendered or treated as an issue at any stage of the administrative proceeding and no justification for the tardy attempt has been made or suggested. It would be improper to consider the contention, if it be such, here. See sections 10(e) and (f), National Labor Relations Act; N.L.R.B. v. Bradford Dyeing Assn., 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 122 (1940); N.L.R.B. v. Cheney California Lumber Co., 327 U.S. 385, 66 S.Ct. 553, 90 L.Ed. 739 (1946); N.L.R.B. v. Giustina Bros. Lumbering Co., 253 F.2d 371 (9th Cir. 1958).

work, are facts which together are persuasive that respondent played the prominent role in the affair. Employers are not in the habit of dismissing competent employees merely to replace them; this is especially true when the change entails no little inconvenience and some expense. There must be some reason and here the trial examiner's deduction that respondent was the motivating factor affords a logical explanation buttressed by cogent evidence.

Respondent, however, insists that the examiner should not have attributed significance to the fact that Carlson's replacement was a union member. It points out that Cascade, under its contractual arrangements with respondent, was obliged to employ an applicant who possessed the most experience in the particular type of work, regardless of his union or nonunion status; and it argues that if Todd did make the statement attributed to him regarding union men being out of work, "it cannot be said that he was not referring to the fact that there were 'sufficient available, qualified persons * * * to meet the employment requirements of the Producer' at the time that Cascade hired Carlson in the first place as a new employee without any Industry seniority." There are at least two adequate answers to that argument: first, that it was for the finder of fact to interpret the remark; second, that there was no proof whatever that the replacement's experience in the particular craft and classification of work was superior to that possessed by Carlson.

Respondent's second ground of attack presents for review several rulings of the Trial Examiner and the Board regarding the admission of evidence.

■ Carlson was allowed to testify concerning a visit to respondent's offices in May 1956 and again in September 1957; respondent's objection was that the testimony was immaterial and too remote in view of the admitted fact that Carlson was hired by Cascade and his employment commenced in April 1948.

In overruling the objection the trial examiner stated that this testimony was offered "as background evidence which would shed light on the more proximate conduct of the parties"; the Board denied respondent's exception. At best the proof anticipated a defense but since the respondent offered no defense the proof was improper and the ruling was error. But the result was patently innocuous.

■■ On the premise that Carlson's testimony consisting of Loftus' statement that "he [Loftus] was very sorry that he had the union on his back and was forced to let me go by the end of the week" was hearsay, the respondent urges that its objections to that testimony and other similar testimony given by the witness Selson should have been sustained. Respondent observes in its brief that "[i]n receiving such hearsay testimony and permitting it to stand, over exceptions, the trial examiner and the Board assert that it is all 'direct evidence' addressed to establishing that Carlson was discharged by the company in violation of section 8(a) (3) of the Act * * *." Respondent argues that "[t]his reasoning ignores the fact that such alleged conversation might constitute 'direct evidence' in an 8(a) (3) proceeding against the Company, but constitute objectionable hearsay when introduced against the Union to prove the truth of the statements supposedly made by the employer in an 8(b) (2) case." However, this argument overlooks the nature of the violation charged and the limited purpose for which the proof was admitted. Petitioner correctly notes elsewhere in its brief that the charge that the union caused the employer to discharge his employee is "derivative" and thus required proof, if it was to be sustained, of the employer's unlawful discrimination against its employee, as well as proof that a particular labor organization caused the employer to so discriminate. Radio Officers' Union of, etc., v. N.L.R.B., 347 U.S. 17 at 53, 74 S.Ct. 323, at 342, 98 L.Ed. 455; N.L.R.B. v. International Longshoremen's & Warehousemen's Union, 210 F.2d 581 (9th

Cir. 1954). In this proceeding the testimony was admitted by the trial examiner and considered by both him and the Board not to prove petitioner's coercion of employer discrimination but solely to establish the fact that Cascade had engaged in conduct which would violate section 8(a) (3). So limited, the admission and consideration of the testimony was proper.

■■■■ The final matter for review under respondent's second ground stems from the admission of an exhibit. During redirect examination as a witness for the General Counsel Loftus expressed doubt that Todd had requested or directed him to discharge Carlson. The witness was then confronted with a document which he identified as his prehearing statement given to a Board agent. Therein appeared the witness' declaration that Todd had "advised [him] * * to let Carlson go." The document was admissible to impeach the witness but clearly could not be used to establish the truth of the fact stated. N.L.R.B. v. Quest-Shon Mark Brassiere Co., Inc., 185 F.2d 285 (2nd Cir. 1950). The trial examiner, over respondent's objection, admitted the exhibit "for the purpose for which it is offered", but due to the confused state of the record with respect to the scope of the offer, the trial examiner's ruling is at best ambiguous. Respondent urges that this exhibit was erroneously employed by the examiner, thus tainting the findings because the Board "simply adopt[ed] the trial examiner's ultimate findings summarily." There is no warrant in the record for this charge. The Board did not abdicate its fact finding duty; on the contrary, it was not only quick to recognize that the trial examiner might have erred but gave respondent the benefit·of that doubt and expressly noted that its own finding on the issue was based upon evidence other than the exhibit.

Respondent's attack on the form of the order is premised on the contention that the remedy prescribed by the Board is (a) excessive and (b) inequitable.

■■ Certain of the provisions contained in the order clearly come within the first category. Thus the Board in a sweeping direction commands respondent to cease and desist from causing or attempting to cause not only Cascade but "any other employer" to discharge, terminate "or in any other manner" discriminate against employees in violation of the Act. There is no suggestion that respondent was similarly involved with any other employer than Cascade, nor that the particular unfair labor practice consisted of any proscribed conduct other than that charged. The quoted portions of the order are, as respondent urges, indefinite, beyond any issue properly before the Board and unwarranted by the evidence; they should be stricken. Communication Workers of America v. N.L.R.B., 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed. 2d 896 (1960); Morrison-Knudsen Co. v. N.L.R.B., 276 F.2d 63 (9th Cir. 1960).

■■■ The order further directs respondent to notify Cascade that it has no objection to Carlson's employment, to request Cascade to offer him reinstatement "to the position he formerly held" even if dismissal of an incumbent is necessary to make room for him and to compensate him for loss of pay in accordance with the Woolworth formula. (F. W. Woolworth Co., 90 N.L.R.B. 289 (1950). The Board, says respondent, in imposing these affirmative requirements upon it, acted arbitrarily and overlooked or deliberately ignored the undisputed evidence that the position Carlson occupied was a temporary one and also failed to take into consideration that his eligibility, in any event, is governed by the industry-wide seniority agreement and that he was subject to discharge under the union security provision of the collective bargaining agreement between Cascade and respondent.

■■ There is no merit in any of these attacks. The Board possesses the power "to undo the effects of discrimination" (Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 189, 61 S.Ct. 845, 850, 85 L.Ed. 1271 (1941)) and this order goes

no further than to exercise that power within the limits of the supported findings.

■ Respondent, likewise, is unduly critical of the provisions requiring it to clear the way for Carlson to regain employment at Cascade and reimburse him for back pay.

Orders containing provisions identical to those appearing in the one under consideration but directed to employers have been interpreted in the light of the nature of the work and the existence of the particular position. Thus in N.L.R.B. v. C. Nelson Mfg. Co., 120 F.2d 444, 446 (8th Cir. 1941) the Eighth Circuit, speaking of such an order, said:

> "The employment of the men was seasonal and the order of the Board can not be construed to mean that the four men must be furnished employment at a period when no employment is available. Nor does the order mean that the employees are to be paid wages for the entire period that has elapsed since their discharge. The plain meaning of the order is that the four men are to be restored to their former positions and given work when other like employees are given work, and the back pay that shall be paid them is measured by what they would have earned during the period if they had not been discharged, taking into account the seasonal character of the business."

This is also the position of the Fourth Circuit in N.L.R.B. v. Planters Mfg. Co., 106 F.2d 524 (1939). True, the jobs in both cases were seasonal as against work which here was shown without dispute to be temporary and there employers, rather than labor organizations, were the ones to whom the orders were given, but we perceive nothing in those differences or in this record that would prevent this court from similarly construing the order under review.

We construe the Boards' order here to do no more than direct respondent to withdraw its objection to Carlson's return to the particular job he formerly held and to refrain from any retaliation against Cascade if in the process Cascade discharges anyone who now occupies that position. What Cascade's reaction and response may be is no concern of respondent.

■ That the order does not fix the precise amount to be paid Carlson affords respondent no basis for valid complaint. We agree with the Fourth Circuit that:

> "General orders of this sort entered by the Board with respect to back pay and reinstatement manifestly contemplate further administrative action on its part, i. e. determination of the exact amount of back pay to be tendered and determination as to what positions are available and substantially equivalent for the purposes of the reinstatement ordered. Such general orders are analogous to interlocutory judgments of courts fixing liability but leaving for future determination questions as to amount of liability; and our decrees affirming or enforcing them are analogous to our affirmance of interlocutory judgments on appeal. After the general order of the Board for back pay and reinstatement is affirmed or ordered enforced by us, the Board must work out the details of reinstatement and of the amounts to be paid as back pay under the general provisions of the order. This can ordinarily be done by negotiation; but, if controversy arises, the facts must be found by the Board, the body to which Congress has committed the administrative process." Home Beneficial Life Ins. Co. v. N.L.R.B., 4 Cir., 172 F.2d 62, 63 (1949).

The order of the Board, modified in accordance with the view herein expressed and as interpreted by this opinion, will be enforced. Respondent's petition is denied.