B. G. COSTICH & SONS, INC., East End Moving & Storage, Inc., Wm. J. Renner Carting Co., Inc. and Service Storage, Inc., Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 330, 767, Dockets 79–4125, 79–4141.

United States Court of Appeals, Second Circuit.

Argued Nov. 8, 1979.

Decided Jan. 8, 1980.

Woods, Oviatt, Gilman, Sturman & Clarke, Rochester, N. Y. (Samuel P. Merlo, Matthew M. Greenblatt, Rochester, N. Y., of counsel), for petitioners.

Joseph P. Norelli, Washington, D. C. (John S. Irving, John E. Higgins, Jr., Robert E. Allen, Elliott Moore, Washington, D. C., of counsel), for respondent.

Before FEINBERG and MANSFIELD, Circuit Judges, and MISHLER,* District Judge.

MISHLER, District Judge:

Petitioners, four employers who are members of the Rochester Truckmen's and Workmen's Association (the "Association"), petition this court pursuant to section 10(f) of the National Labor Relations Act, (the "Act"), 29 U.S.C. § 160(f), to reverse and deny enforcement of an order of the National Labor Relations Board dated June 26,

---

* Honorable Jacob Mishler, United States District Judge, Eastern District of New York, sitting by designation.

1979.[1] The Board has filed a cross-application seeking enforcement of that order, which directed the petitioners to cease and desist from engaging in conduct which the Board determined constituted an unfair labor practice, violative of sections 8(a)(3) and (1) of the Act, 29 U.S.C. §§ 158(a)(3), (1).[2] Specifically, the Board found that petitioners had made contributions to the New York State Teamsters Conference Pension and Retirement Fund (the "Fund") on behalf of casual employees who were members of the Chauffeurs, Teamsters and Helpers, Local Union No. 118 (the "union"), but had failed to make such contributions on behalf of non-union casual employees. In the view of the Board, such conduct constituted "discrimination with respect to terms of employment" which "inherently encouraged union membership and violated Section 8(a)(3) of the Act."[3] Because we believe that the record does not support the conclusion that the petitioners' conduct encouraged union membership, we grant their petition.

## BACKGROUND

The pertinent facts are not in dispute. Petitioners, together with other members of the Association, are engaged in the business of moving and storing household goods in the Rochester, New York area. For approximately the last 25 years, the Association has bargained on behalf of its members with the union, the exclusive bargaining agent of truck drivers, helpers and other workers in the employ of Association members who are described in Article 1 of the current collective bargaining agreement. Critical to our inquiry is the fact that that agreement, effective from April 16, 1977 to April 15, 1980, contains in Article 2 a union security clause, requiring that all employees in the bargaining unit join the union after 30 days of employment. The agreement also provides, in Article 23, that the employer will contribute certain specified amounts to the fund on behalf of "any and all of his employees covered by [the] Agreement." These amounts are based on the number of hours an employee works, but in no event may an employer contribute for more than 40 hours worked per week. Article 23 goes on to state that the "Fund shall be open to participation by any group of members belonging to a participating Local and any or all other employees of a participating Employer not members of the Union." Pursuant to the terms of the Pension Plan administered by the Fund, participating employees become eligible for normal pension benefits after the age of 60 if they have accumulated at least 15 years of credited service.[4]

When the need arises, petitioners hire casual employees. According to the terms of the collective bargaining agreement, a "casual employee is one hired to cover jobs caused by vacation, sickness, absenteeism and leaves of absence . . . ." Article 2, Section 2. These employees—both union and non-union—have performed the same work and received the same wages as regular employees. However, as a practice, contributions have been made to the Fund only on behalf of those casual employees who were union members.

Apparently neither the union nor the non-union casual employees have ever ob-

---

1. The decision of the Board is reported at 243 N.L.R.B. No. 18 (1979).

2. As will be discussed below, the Board also ordered the petitioners to take certain remedial action.

3. The quoted language is that of the Administrative Law Judge, whose "rulings, findings, and conclusions" were affirmed in pertinent part, see note 10 infra, by the Board. The Administrative Law Judge had tracked closely, but not precisely, the language of section 8(a)(3), which provides in pertinent part, that

"[i]t shall be an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

4. Reduced pension benefits are available to employees 55 years of age who have accumulated 15 years of credited service. In addition, slightly reduced benefits are available to an employee who, regardless of age, has accumulated 30 years of credited service.

jected to this longstanding practice. However, in 1977 the Fund notified the petitioners and other members of the Association that it believed that under the collective bargaining agreement the employers were required to make pension payments on behalf of non-union casuals. The Association members then brought suit against the Fund in New York State Supreme Court, Monroe County, seeking judgment declaring that the collective bargaining agreement did not impose such an obligation. On August 2, 1978, Justice Robert H. Wagner of that court issued a written decision in which he found that "pursuant to the terms of the . . . Agreement [the employers] are obligated to make pension contributions on behalf of union employees only." *Boulter Carting Co., Inc. v. DePerno*, No. 925/78 (Sup.Ct. Monroe Co. Aug. 2, 1978).

Prior to that decision, on April 19, 1978, the Fund filed with the Board the unfair labor practice charges which are at issue here. The Board's complaint, issued on June 16, 1978, recited that "from on or about October 19, 1977 and continuing to date" the employers [5] had made contributions to the Fund only on behalf of union casuals, and that by doing so they had violated § 8(a)(3) of the Act.[6]

A hearing was held before Administrative Law Judge David S. Davidson on September 28 and 29, 1978. The only evidence introduced by the General Counsel against the petitioners were stipulations that from October 19, 1977 to the date of the hearing: (a) Petitioner Costich had employed 27 casual employees, one of whom was a union member. Costich made contributions to the Fund only on behalf of the union member; (b) Petitioner East End had employed 39 casual employees, seven of whom were union members. East End made contributions to the Fund only on behalf of those seven; (c) Petitioner Renner had employed 15 casual employees, one of whom was a union member. Contributions to the Fund were made only on his behalf; and (d) Petitioner Service Storage had employed 37 casual employees, eight of whom were union members. Contributions to the Fund were made only on their behalf.

Officers of the employers then testified. As is pertinent here,[7] their testimony indicated that casual employees were hired for time periods ranging from "four hours to a couple of days." The casuals were hired in a number of ways. Sometimes, employers would seek employees through the New York State Department of Labor. On occasion, individuals appeared at the employers' establishments seeking work. At other times, an employer would contact individuals from a list kept of those who had previously worked as a casual for that employer. One employer testified that he hired off-duty firemen. The employers further testified that they made payments to the Fund on behalf of union casuals because they believed—apparently by reason of the union security clause—that these casuals had greater experience than non-union employees. Significantly, notwithstanding the fact that they desired to hire experienced casuals, the employers did not ask prospective workers whether they belonged to the union. They learned for the first time whether an employee was a union member when, after he finished working and was about to be paid, the inquiry was made of the employee so that a determination could be made whether to make a contribution on

---

5. In addition to the petitioners, the Board's complaint named seven other Association members. The charges against those seven, however, were withdrawn during the course of the hearing before the Administrative Law Judge.

6. The complaint also charged, and the Board found, a violation of section 8(a)(1). However, because the alleged violation of that section arises out of the same operative facts that surround the charged section 8(a)(3) violation,

the Administrative Law Judge, the Board, and the petitioners have not treated it discretely, apparently assuming that it stands or falls together with the 8(a)(3) charge. We follow suit.

7. Evidence was also offered on the petitioners' contractual intent when they entered into the collective bargaining agreement. That evidence is not germane to our discussion, *see* note 12 *infra*.

his behalf. Testimony was also elicited that the employers did not advise non-union casuals that payments to the Fund were being made solely on behalf of union members. Three of the petitioners did state, however, that every month, pursuant to an agreement with the Fund, they posted in a prominent place a form reflecting contributions made to the Fund in that month; the fourth stated that the report was shown to the shop steward. Finally, the employers testified that they never intended to violate the Act or to encourage non-union members to join the union, and that by virtue of the state court decision they believed their conduct was lawful.

As a rebuttal witness, the General Counsel called the Administrator of the Fund. He testified that in order for an employee to obtain one year's credit towards pension benefits, an employer must make contributions for each of one thousand hours worked by that employee. Thus, if contributions are made for each of one hundred hours worked by an employee, that employee acquires one-tenth of a year's credit.[8] As noted above, however, there is a limitation to this procedure since the collective bargaining agreement fixes a maximum contribution based on forty hours worked per week.

Based on the testimony and the documentary evidence, the ALJ found that the petitioners had violated the Act. First, he determined that the state court had erroneously interpreted the collective bargaining agreement and that it did, in fact, require the payment of Fund contributions on behalf of both union and non-union members. He further found that casual employees were members of the bargaining unit covered by the agreement and that the agree-

ment thus obligated the employers to make Fund contributions on those employees' behalf.

The ALJ then held that the petitioners' practice constituted discrimination in regard to terms or conditions of employment, rejecting the employers' argument that their practice would not cause the non-union casuals to lose pension benefits since they would never acquire the 15 years of credited service time required to become eligible for benefits. In his view, this contention, "premised on the assumption that non-member casuals will never become regular employees," was unsound since the very terms of the collective bargaining agreement "contemplate that casual employees may become regular employees. . . ."[9] Moreover, the ALJ observed that "many employees may never accumulate 15 credited years" but that the employers were nonetheless obligated to make contributions on their behalf. Most importantly, "to the non-member casual who ultimately becomes a regular employee, [the] failure to make payment to the Fund while he is not a member may result in his being required ultimately to work longer than a member casual to become eligible for a pension."

For similar reasons, the ALJ rejected the claim that since non-member casuals were required by virtue of the union security clause to join the union 30 days after the start of employment, "any discrimination [was] de minimis because it result[ed] in at most loss of one-tenth of a credit for failure to contribute on behalf of an employee for the first 30 days of his employment." The ALJ reasoned that "the requirement that an employee work an additional 30 days to be eligible for retirement is hardly trivial. . . ."

8. Although it is not of critical importance, we should note that our reading of the terms of the Pension Plan is slightly at odds with the Administrator's. Under the Plan's terms, where an employer contributes more than 52½¢ per hour on behalf of an employee, the employer must contribute a total minimum amount of $660 during a calendar year in order for the employee to receive credit for a year's service. Since, under the terms of the collective bargaining agreement, the petitioners are present-

ly required to contribute 77½¢ per hour for each employee, the $660 figure will be satisfied at some time prior to the employee having worked 1000 hours.

9. As the Administrative Law Judge accurately pointed out, Article 2, section 2 of the collective bargaining agreement accords casual employees certain seniority rights with respect to regular job openings.

The ALJ then disposed of petitioners' argument that the alleged discrimination could not encourage union membership since there was no evidence that non-member casuals knew of the petitioners' practice regarding Fund contributions. In light of the fact that the employers posted a report of their contributions to the Fund or advised the shop steward of the report, the ALJ found that "it [was] reasonable to infer that employees were aware of [the employers'] discriminatory practice."

Lastly, the ALJ held that petitioners had violated the Act, notwithstanding the fact that no affirmative evidence of discriminatory intent had been introduced. In his opinion, the lack of such evidence was not critical since petitioners' conduct "inherently encouraged union membership," and, therefore, under the rule of *Radio Officers' Union v. N. L. R. B.*, 347 U.S. 17, 45, 74 S.Ct. 323, 338, 98 L.Ed. 455 (1954), "specific proof of intent [was] unnecessary . . . ." In making this determination, the ALJ did not comment on petitioners' testimony to the effect that they had made contributions only to union casuals because those employees were more experienced than non-union casuals. He did, however, reject their contention that discriminatory intent could not be proved because the state court had sanctioned the petitioners' practice. From the evidence, "the conclusion [was] warranted that . . . [petitioners] did not institute contributions on behalf of the member casuals because of the court decision [but] that it had a longstanding practice of making such contributions." Based on his conclusions, the ALJ recommended that the Board order the petitioners to cease and desist from "discriminating against casual employees with regard to the payment of pension fund contributions because they are not members of the [the union]," and to make retroactive payments, together with interest, on behalf of non-union casuals for a period from October 19, 1977, six months before the charge was filed. In pertinent part,[10] the Board adopted and issued the recommended order.

## DISCUSSION

As the Supreme Court stated in *Radio Officers' Union v. N. L. R. B., supra*, 347 U.S. at 42–43, 74 S.Ct. at 337:

The language of § 8(a)(3) is not ambiguous. The unfair labor practice is for an employer to encourage or discourage [union] membership by means of discrimination. Thus this section does not outlaw all encouragement or discouragement of membership in labor organizations; only such as is accomplished by discrimination is prohibited. Nor does this section outlaw discrimination in employment as such; only such discrimination as encourages or discourages membership in a labor organization is proscribed.

■ Yet, it is not sufficient merely to demonstrate discriminatory conduct and resulting encouragement or discouragement. Rather, "the added element of unlawful intent is also required." *N. L. R. B. v. Brown*, 380 U.S. 278, 286, 85 S.Ct. 980, 985, 13 L.Ed.2d 839 (1965). As a practical matter therefore, "[i]t has long been established that a finding of violation under . . . section [8(a)(3)] will normally turn on the employer's motivation." *American Ship Building Co. v. N. L. R. B.*, 380 U.S. 300, 310, 85 S.Ct. 955, 963, 13 L.Ed.2d 855 (1965).

■ Recognizing the usual importance of the Board's establishing that discriminatory conduct was motivated by a desire to encourage union membership, petitioners focus part of their attack on the Board's finding on that point and contend that it failed to give appropriate weight to their claim that the challenged conduct was entered into for legitimate reasons, wholly divorced from pro-union motivation. According to the petitioners, the existence of the union security clause required employees to join the union after 30 days of employment with an Association member. Accordingly, they continue, it was fair for

---

10. The Board modified the proposed order by deleting the provision for a fixed rate of interest on the retroactive payments.

them to assume that union casuals had worked for those 30 days while non-union casuals had not. Thus, they conclude, the practice of giving an added benefit to union members was justified by the legitimate hope of attracting more experienced casuals.

As we noted above, the ALJ did not deal with this preferred explanation in his decision. Instead, he merely determined that the challenged conduct "inherently encouraged union membership," and that under the rule of *Radio Officers' Union v. N. L. R. B., supra,* no independent proof of unlawful intent was thus required.

In our view, resolution of this controversy does not turn upon whether the Board's decision was correct under *Radio Officers'* or subsequent cases dealing with the power of the Board to find improper motivation in the face of an employer's explanation for his conduct. *See, e. g., N. L. R. B. v. Great Dane Trailers, Inc.,* 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); *American Ship Building Co. v. N. L. R. B., supra* ; *N. L. R. B. v. Brown, supra* ; *N. L. R. B. v. Erie Resistor Corp.,* 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). While it is true that these cases permit inferences of improper motivation to be drawn from the challenged conduct itself, it is patent that no inquiry into motivation is necessary unless that conduct is first found to have encouraged or discouraged union membership, *Radio Officers' Union v. N. L. R. B., supra,* 347 U.S. at 45, 74 S.Ct. at 338, or at the very least, until it is shown that the conduct "could have adversely affected employee rights to *some* extent . . . ." *N. L. R. B. v. Great Dane Trailers, Inc., supra,* 388 U.S. at 34, 87 S.Ct. at 1798 (emphasis in original). From the record, it appears the challenged conduct here did not encourage union membership—either inherently or otherwise—and, indeed, did not even carry the "potential" of doing so. *See id.* at 35, 87 S.Ct. at 1798. Accordingly, even if improper motive were found, no section 8(a)(3) violation could be made out since, as we noted at the outset of our discussion, "only such discrimination as encourages or discourages membership in a labor organization is proscribed." *Radio Officers' Union v. N. L. R. B., supra,* 347 U.S. at 43, 74 S.Ct. at 337. *See also N. L. R. B. v. Milk Drivers & Dairy Employees, Local 338,* 531 F.2d 1162, 1166 (2d Cir. 1976) ("[U]nder § 8(a)(3) . . . encouragement of membership is a *sine qua non* of a violation.").

The Board's conclusion regarding "inherent" encouragement was premised on the unremarkable principle that where union employees receive a benefit not afforded to non-union employees, members of the latter group will naturally prefer to place themselves within the former. While this principle has been validly applied in numerous situations, we find that on the facts before us the "benefit" to union members would not induce casual employees to join the union.

It is conceded that union casuals here received a benefit that their non-union counterparts did not, *i. e.,* contributions to the Fund. However, the non-union casuals were subject to this discriminatory treatment for no more than 30 working days since after that time they were required, under the union security clause, to join the union. More importantly, the benefit was one that would not be realized—at the earliest—until the employee accumulated 15 years of credited service. Indeed, because an employee does not become eligible for normal pension benefits until he reaches the age of 60,[11] an entering employee may be required to work for much longer than 15 years. In short, to find a section 8(a)(3) violation here, the Board had to conclude that an entering employee was encouraged to join the union by the desire to receive benefits of 30 days duration which would not be realized for at least 15 years. In our view, such a conclusion was highly speculative, if not imaginative.

Our determination is reinforced by consideration of the type of employee who was the subject of the allegedly "encouraging"

---

11. *See* note 4 and accompanying text *supra.*

conduct. From the record it seems clear that most of the casual employees were individuals who did not intend to make a career in the industry. This is evidenced by the fact that many were hired for periods of short duration through sources such as the Department of Labor. Further evidence is supplied by the fact that 101 of the 118 casual employees hired by petitioners in the six months preceding the Board's filing of the complaint were not union members. Common sense dictates the conclusion that the thought of receiving retirement benefits 15 years down the line would be the furthest thing from these employees' minds when they sought work. Indeed, the very fact that 101 of the 118 casuals were not union members supplies empirical evidence that the challenged practice did not serve as a source of encouragement to join the union.

We thus think that the facts here clearly serve to distinguish those cases cited by the Board in its brief in which inherent encouragement was found. In all of those cases, unlike this one, an employer's challenged conduct had an immediately realizable impact on employee rights. For example, in *N. L. R. B. v. Gaynor News Co.*, 197 F.2d 719 (2d Cir. 1952), which was affirmed by the Supreme Court in *Radio Officers' Union, supra*, the benefit received by union workers which was not afforded to non-union workers was additional pay and vacation benefits. Obviously, the hope of receiving such immediately cognizable benefits served to encourage non-union members to join the union, for, as the Supreme Court noted, as "a fact of common experience . . . the desire of employees to unionize is directly proportional to the advantages thought to be obtained from such action." 347 U.S. at 46, 74 S.Ct. at 338–39. However, where, as here, the advantage sought to be obtained is reduced to a point that is so miniscule and contingent that it may never be realized, the desire to unionize is proportionately reduced to the vanishing point. For similar reasons, *N. L. R. B. v. Milk Drivers & Dairy Employees, Local*

*338, supra*, and *N. L. R. B. v. Local 50, Bakery & Confectionery Workers Union*, 339 F.2d 324 (2d Cir. 1964), *cert. denied*, 382 U.S. 327, 85 S.Ct. 62, 15 L.Ed.2d 72 (1965), are inapposite. In *Milk Drivers*, an 8(a)(3) violation was established where it was found that by becoming a "good" union member, *see Radio Officers' Union, supra*, 347 U.S. at 40, 74 S.Ct. at 335, an individual had the opportunity to become a shop steward and thus obtain super-seniority. *See* 531 F.2d at 1165. And, in *Local 50*, the court found an 8(a)(3) violation where an individual lost his job by reason of his withdrawal from union membership. It is apparent that the benefits gained in these cases by union membership were both quantitatively and qualitatively different from the benefit at issue here.

Lastly, we should note that in *Local 138, International Union of Operating Engineers v. N. L. R. B.*, 321 F.2d 130 (2d Cir. 1963) and *Prestige Bedding Co., Inc.*, 212 N.L.R.B. No. 104 (1974), section 8(a)(3) violations were found where it was determined that pension or insurance benefits were available to union, but not to non-union employees. However, those cases, unlike the instant one, did not deal with part-time temporary employees who never held the reasonable expectation or desire of receiving the additional benefits afforded only to union employees.

### CONCLUSION

We well recognize that

[T]he Board knows the facts of life in the labor world better than we ever can; we ought not upset its conclusion as to "encouragement" unless we can say this is without rational basis.

*N. L. R. B. v. Local 50, supra*, 339 F.2d at 328 n.4 (quoting *N. L. R. B. v. Miranda Fuel Co.*, 326 F.2d 172, 184 (2d Cir. 1963) (Friendly, J., dissenting)). However, on the facts before us, we conclude that the Board's finding is without the required rational basis.[12]

Enforcement denied.

---

**12.** We do not pass on the issue of whether the Board correctly interpreted the collective bargaining agreement as requiring that pension contributions be made on behalf of non-union

casuals. We hold simply that the failure to make such contributions did not, in and of itself, constitute a violation of § 8(a)(3).